IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 07-cv-01145-DME-KMT


GENERAL STEEL DOMESTIC SALES, LLC,
d/b/a GENERAL STEEL CORPORATION, a Colorado Limited Liability Company,


      Plaintiff,

v.

STEELWISE, LLC, a Colorado limited liability company,
HAROLD G. DONAHUE, individually,
DANA BEERS, individually,
SUE BEERS, individually, and
KIRK JARVIS, individually,
ADAM SCHRAGER, individually,

      Defendants,

and

GETA ASFAW, an individual
BOWEN BANBURY,an individual
DARREL BROWN, an individual
TOTI CADAVID, an individual
JANICE CAMPBELL, an individual
JOE CONRAD, an individual
COUNCIL OF BETTER BUSINESS BUREAUS, INC., a Delaware corporation,
DENVER BOULDER BETTER BUSINESS BUREAU, a business membership organization,
LARRY DUDMAN, an individual
HOPE MARIE DUNLAVEY, an individual
MATTHEW FEHLING,
GANNETT, CO., INC.,
BARBARA GRIMM, an individual,
BRECKENRIDGE GROVER, an individual,
JEAN HERMANN, an individual,
KENNETH J. HUNTER, an individual,
MARK JOHNSON, an individual,

JERALD KAISER, an individual,
TONY KING, an individual,
DONLEE LANE, an individual,
TAMELA LEE, an individual,
JEFF METZ, an individual,
ROB NAISH, an individual,
DEAN PISCIOTTA, an individual,
MARK RENN, an individual,
CRAIG REYNOLDS, an individual,
JON ROBINSON, an individual,
CARRIE KING ROSSMAN, an individual,
STEVEN SALTER, an individual,
BILL STEVENSON, an individual,
JOE TOSCANO, an individual,
CHIP YOST, an individual,

     Consolidated Defendants.

---

# ORDER

---

     This matter is before the court on defendants Denver/Boulder Better Business Bureau,

Council of Better Business Bureaus, Inc., Bill Stevenson, Tony King, Steven Salter, Tamela Lee,

Rob Naish, Kenneth J. Hunter, Donlee Lane, Matthew Fehling, Jeff Metz, Janice Campbell,

Larry Dudman, Carrie King Rossman, Jon Robinson, Barbara Grimm, Joe Toscano, Darrel

Brown, Toti Cadavid, Dean Pisciotta, Bowen Banbury, Geta Asfaw, Mark Johnson,

Breckenridge Grover, Mark Renn, Hope Marie Dunlavey, Jean Hermann, Craig Reynolds, Joe

Conrad, and Jerald Kaiser (collectively BBB defendants) "Motion for Determinations of

Questions of Law Impacting Discovery Pursuant to Fed. R. Civ. P. 16 and the Court's

Supervisory Power and Brief in Support" ("BBB Mot.")[Doc. No. 154, filed September 17,

2008]. Plaintiff General Steel filed a Response on October 7, 2008 [Doc. No. 186] and the BBB

defendants filed a Reply Brief in Support of their motion on October 21, 2008 [Doc. No. 205].

On January 12, 2009, the BBB defendants filed a supplement brief. [Doc. No. 264].

At issue in this motion are two clauses contained in state court settlement agreements

between General Steel and others. The first involves a restriction on California consumer fraud

investigators and prosecutors from voluntarily cooperating with any third party, including the

BBB defendants, in any litigation involving General Steel. The second is a clause contained in a

number of settlement agreements executed between General Steel and certain of its customers as

a result of the settlement of Phase II of Case No. 04CV0143, *State of Colorado v. General

Steele*, et al. in Jefferson County District Court. That clause not only prohibits the settling

customers from voluntarily cooperating with any third party, including the BBB defendants, in

litigation involving General Steel, but also gags the consumers with respect to any matters

touching upon the litigation and claims which were settled as part of the agreement.

The BBB defendants argue that the confidentiality and non-cooperation clauses were

deliberately inserted into the settlement agreements for the express purpose of prohibiting the

BBB defendants from obtaining witness testimony which would support their defense. They

argue the provisions should be voided as against public policy and as obstructive of these federal

proceedings. General Steel argues that both clauses are binding contractual provisions, legally

bargained for between itself and others which are not a violation of any public policy and should

not be interfered with by the court.

*Background*[1]

Plaintiff General Steel sells pre-manufactured steel buildings that can be used for everything from storage containers to gymnasiums to churches. General Steel has been in the midst of a maelstrom of litigation since 2003, when the Colorado Attorney General and the Sacramento District Attorney began investigating it for various alleged violations of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§ 6-1-101 *et seq.,* and California consumer protection laws, respectively. The Colorado Attorney General filed an enforcement action that arose out of their investigation, and thereafter General Steel sued numerous third parties alleging a conspiracy between the individuals and entities to create the false impression that General Steel was violating consumer protection laws, engaging in unfair business practices, and advertising illegally. General Steel initiated its first round of suits in Colorado state court, proceeding on various state tort and contract theories. General Steel then filed a complaint on February 26, 2006, in the U.S. District Court for the Eastern District of California. In that complaint, General Steel alleged that some sixty defendants[2]: (1) conspired together in violation of the Racketeering Influenced Corrupt Organizations Act ("RICO"), 18

---

[1]The Background facts herein are taken from Judge David Ebel's Order of April 11, 2008. [Doc. No. 114].

[2]The list included individual employees of the Colorado Attorney General's Office, the Sacramento District Attorney's Office, and the New Mexico Attorney General's Office; past and present employees and directors of the BBB; Gannett Co. TV station and its employee Chip Yost, a reporter; Steelwise LLC and individual employees of Steelwise (collectively, the "Steelwise defendants"); and General Steel customers Dana Beers, Sue Beers, and Kirk Jarvis (collectively, the "Nebraska defendants").

4

U.S.C. § 1961, to ruin General Steel's business by precipitating government prosecution of

General Steel for consumer law violations, and (2) violated General Steel's civil rights under 42

U.S.C. § 1983.  On April 21, 2006, certain of those defendants moved to dismiss for lack of

personal jurisdiction, while the BBB defendants sought a stay of the federal proceedings under

the *Younger v. Harris*[3] abstention doctrine and, alternatively, the *Colorado River*[4] doctrine.

When the BBB defendants first moved for a stay of the federal suit pursuant to *Younger*

and, alternatively, pursuant to *Colorado River*, the key cases in the state courts were:

• *General Steel Domestic Sales, L.L.C. v. Denver/Boulder Better Business Bureau, Jean Herman and Matt Fehling* ("Colorado BBB action"), Jefferson County Colorado District Court, Case No. 2004-CV-155 (filed January 16, 2004) ("BBB state action");

• *State of Colorado v. General Steel Domestic Sales, L.L.C.* ("Colorado AG action"), Jefferson County Colorado District Court, Case No. 2004-CV-143 (filed January 16, 2004) (an enforcement action brought against General Steel for violations of Colorado's Consumer Protection Act);

• *General Steel Domestic Sales, L.L.C. v. Harold Donahue and Steelwise, Inc.* ("Colorado Steelwise action"), Denver County Colorado District Court, Case No. 2004-CV-9181 (filed November 5, 2004) (an action brought against a former employee of General Steel and the competing business that former employee founded); and

• *State of California v. General Steel Domestic Sales, L.L.C.* ("Sacramento DA action"), Sacramento California Superior Court Case No. 05AS3689 (filed August 22, 2005) (an enforcement against brought by the Sacramento County District Attorney against General Steel for violations of California's unfair business practices and consumer protection laws).

---

[3]401 U.S. 37 (1971).

[4]*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976)

The Eastern District of California originally granted the BBB defendants' motion for a stay based on the *Younger* abstention doctrine while the remaining Colorado state court actions ran their course. Simultaneously, the California federal court dismissed General Steel's claims against the Steelwise defendants and the Nebraska defendants in that case for lack of personal jurisdiction. General Steel then reinitiated its claims against those defendants in federal court in the District of Colorado.

The Colorado AG action and the Sacramento DA actions both settled in 2007, resulting in the entry of consent decrees in January 2007 (the Sacramento action) and March 2007 (the Colorado action). Settlement negotiations were largely undertaken jointly in those two cases. As part of the Colorado settlement, General Steel agreed to: 1) dismiss its claims in the federal court against the Colorado AG and its employees and the Sacramento DA and its employees; 2) abide by the terms of an injunction governing its sales and advertising practices (as originally handed down by Judge R. Brooke Jackson after the Phase I trial in the Colorado AG action in his December 7, 2004 Order); and, 3) pay some $4.5 million in restitution to consumers together with a portion of the costs of the Colorado and California investigations.

After the Colorado AG and Sacramento DA actions settled, the Eastern District of California lifted the *Younger*-based stay, opted not to rule on the *Colorado River* question, and transferred the case to the District of Colorado pursuant to 28 U.S.C. § 1404. There were, then, two federal Colorado cases.

Meanwhile, the Colorado BBB state action was set for a three-week jury trial in Jefferson County District Court (before a different judicial officer than the Colorado AG case) beginning

April 21, 2008. The parties conducted extensive discovery, including 32 depositions and thousands of pages of documentary discovery and expert reports. Eventually, however, General Steel moved to dismiss the BBB state action without prejudice and the court granted that motion over the BBB defendants' objections on March 12, 2008, concluding that the dismissal would not prejudice the defendants and that the work product prepared in that case would prove useful in the litigation pending in what eventually became this one consolidated federal action.

The dispute herein involves the settlement agreements which were executed as a result of the Colorado AG action and the Sacramento DA action and their resulting affect on the BBB defendants' endeavors to interview and elicit testimony from California investigators as well as complaining customers of General Steel.

### *The Settlement Agreements*

Phase I of the Colorado AG action was tried in Jefferson County District Court to the court before Judge R. Brooke Jackson on October 25-29 and November 2-3, 2004. After the trial, Judge Jackson issued forty-one pages of findings and his verdict. *See* December 7, 2004 Order of Judge R. Brooke Jackson, [BBB Mot., Exh. 4, Doc. No. 154-4] (hereinafter "Jackson Order"). Judge Jackson began his findings with the statement, "For all the sound, fury and paper generated in the case, however, it is not that complex. Beyond any legitimate question, General Steel for years engaged in sales practices that were riddled with misrepresentations and omissions." (Jackson Order at 2). Judge Jackson also noted, "no one denies that the buildings sold by General Steel are of good quality." *Id.* The issue before the court came down to "whether and to what extent the offensive conduct [the referenced sales practices] is actionable

under the CCPA, and what remedy is necessary and appropriate to deal with the conduct at this time." *Id.*

During the trial fifteen (15) General Steel customers testified. *Id.* at 21. The court found that, "[t]hese 15 people are only a small fraction of the persons who contracted to buy buildings from General Steel. Moreover, even within this group there were sharp differences in terms of reactions to the sales pitch and in their degree of satisfaction with General Steel's product and services." *Id.* With respect to the dissatisfied customers who testified at trial, the court made specific reimbursement orders such as returning deposits and requiring General Steel to pay the consumers' costs incurred during the transaction. *Id.* at 35-37. The court also imposed civil penalties on General Steel and enjoined the company from further deceptive practices as described in the order, and imposed a requirement that General Steel participate in a monitored compliance plan. *Id.* at 37-41. The final paragraph of the Jackson Order stated

> 15. The Court directs the parties to submit a procedural proposal for the resolution of the State's claims with respect to consumers other than the 11[5] consumers the State called as witnesses at the trial. If they cannot agree, after meeting, conferring and making a good faith effort, they may each submit a proposal. The parties should include in their evaluation of this issue whether alternatives to court trials such as the use of a special master, arbitrator or other non-court means of hearing and resolving claims would be desirable.

*Id.* at 41.

Against this backdrop, General Steel and the three investigating state agencies began negotiations to resolve outstanding issues with respect to "other consumers." On July 7, 2006,

---

[5]The other four customers were witnesses called by General Steel.

General Steel, the Colorado AG, the Sacramento DA and consumer fraud regulators from New Mexico agreed in principle to a resolution of Phase II of the case. (BBB Mot., Exhibit 8, Doc. No. 154-9) The agreement provided, among other things, that General Steel would settle the outstanding consumer claims for approximately $4 million with the individual claims to be administered and decided upon by the Colorado Attorney General's office. *Id.* Another one-half million would be distributed to the three law enforcement agencies to help defray costs of their respective investigations. *Id.* The agreement also provided for the continuation of the injunction, in modified form, previously imposed against General Steel by Judge Jackson. The preliminary settlement also contained the provision, "California agrees that its representatives and investigators will not voluntarily appear or testify in any proceeding brought by or against General Steel." *Id.* at ¶ 6. There has been no explanation given to this court as to why the California investigators entered into such an agreement when the other two law enforcement investigating groups did not.

The final version of the settlement agreement (hereinafter "SA-1") is located both at Exhibit 9 to the BBB Motion, [Doc. No. 154-10] submitted to this court without attachments A, B and C, and also in its entirety with exhibits as attached to General Steel's Response [Doc. No. 186-3 and 186-4]. The document provided by the BBB defendants contains a file stamp indicating, "EFILED Document, CO Jefferson County District Court 1st JD, Filing Date: Jan 5 2007 . . ."

SA-1 states that 7300 customers of General Steele had been contacted by the parties with respect to claims which could have been raised in Phase II of the Colorado AG action and

"approximately 1370 consumers submitted responses." *Id*. at ¶ 2. The prohibition against voluntary cooperation with third parties by the Sacramento District Attorney's Office as proposed by the preliminary agreement was incorporated into SA-1. *Id*. at § C.4. Further, SA-1 acknowledged within its provisions that the BBB defendants' had on file a pending Motion to Intervene in the Colorado AG action.[6] *Id.* at ¶ 9.

Judge Jackson entered the Consent Decree, Exhibit A to SA-1, on March 8, 2007. [Doc. No. 154-11, BBB Mot., Exh. 10].

As provided for in SA-1, a letter dated April 23, 2007 was sent to the 1370 "other consumers" acknowledged in SA-1 as having filed claims. To the letter was attached a "Settlement and Release Form" as well as a form entitled "Elects Not to Participate in Settlement." (BBB Mot., Exhibit 1, Doc. No. 154-2).[7] Settlement and Release forms were eventually signed by 1,333 "other customers." Those settlement agreements are referenced herein collectively as SA-2. The clause to which the BBB defendants object in SA-2 provides

> 5.    CONSUMER agrees to maintain the confidentiality of the terms of this Settlement and Release, and the matters that are or were the subject of he, she, or its claims against General Steel. CONSUMER further agrees that he, she or it will not voluntarily appear or testify in any proceeding brought by or against General Steel. CONSUMER agrees to pay all costs and attorney fees incurred by

---

[6]  The BBB defendants filed a Conditional Motion to Intervene as to the Consent Decree, Exhibit A to SA-1. [Rsp., Doc. No. 188-8]. Clearly, the BBB defendants were in possession of the Consent Decree at the time of the filing of their intervention motion. It is unclear, however exactly when, or if, SA-1 was submitted to Judge Jackson complete with all exhibits.

[7].  The Settlement and Release Form was Exhibit C to SA-1, along with Exhibit A, the proposed Consent Decree, and Exhibit B, the Preliminary Injunction.

General Steel in enforcing this provision.  CONSUMER acknowledges and agrees
that General Steel may pursue all remedies, at law or in equity, to restrain and/or
obtain compensation for any threatened or actual breach of this provision.

BBB Mot., Exhibit 1, at 6, ¶ 5.

### *Legal Analysis*

Issues involving the formation and construction of a purported settlement agreement are

resolved by applying state contract law, *see United States v. McCall*, 235 F.3d 1211, 1215 (10th

Cir. 2000), even when there are federal causes of action in the underlying litigation.  *Gates Corp.*

*v. Bando Chemical Industries, Ltd.*, 4 Fed.Appx. 676, 682, 2001 WL 135686, *4 (10th Cir.

2001).  *But see Snider v. Circle K Corp.*, 923 F.2d 1404, 1407 (10th Cir.1991) (holding

settlement agreements in Title VII cases are governed by federal common law because the

agreements and the statute are "inextricably linked").  The parties do not appear to dispute that

both SA-1 and SA-2 satisfy the basic elements of contract formation.  Both agreements identified

the consideration for which the parties bargained, and the parties' signatures indicated their

mutual assent to those terms.  *Pierce v. St. Vrain Valley School Dist. RE-1J,* 981 P.2d 600, 603

(Colo. 1999); RESTATEMENT (SECOND) OF CONTRACTS § 17(1) (1981) ("[T]he formation of a

contract requires a bargain in which there is a manifestation of mutual assent to the exchange and

a consideration.").

As to the SA-2 agreements with individual customers, the agreement provided that upon

entry into an agreement with General Steele (through the Attorney General's Office) with

respect to their individual claims, the customer would be entitled to a portion of the $4 million

dollars General Steel made available to the Colorado Attorney General's Office to settle,

nationwide, the claims.  Those individual claims would otherwise have required proof at trial or before a quasi-judicial officer.  (Jackson Order at 41.).  *See* SA-1 at 8, ¶ 8.

Colorado public and judicial policies favor voluntary agreements to settle legal disputes. *Gates* at *4.  *See also Colorado Ins. Guar. Ass'n v. Harris*, 827 P.2d 1139, 1142 (Colo.1992) (en banc).  However, a court may enforce a settlement agreement only if it constitutes an enforceable contract.  *Gates, id.*;  *See H.W. Houston Constr. Co. v. District Ct.*, 632 P.2d 563, 565 (Colo.1981) (en banc).  This court finds, however, that while encouraging settlements is important, justice is more important.

### A. *Contractual Provisions in Settlement Agreements.*

This court gegins the analysis from the presumption that at least SA-1 was a valid and legally enforceable contract.  All parties to SA-1 had the benefit of representation by counsel, who presumably offered advice as to the ramifications of the agreements in all respects.  The three governmental entities were represented either by their Attorneys General or the District Attorney and General Steel and its related entities were also represented by competent counsel.

Before Judge Jackson signed the Consent Decree he was also aware of the provisions of SA-1.  (*See* file stamp on BBB Doc. No. 154-10, as noted *infra*).  I note, too, that all the same parties and attorneys participated in the formation of the language used in SA-2 and while I will assume many of the customers were not represented by counsel when they signed the agreements, the two Attorneys General and the District Attorney were all representing the interests of consumers and customers of General Steel, at least insofar as consumer protection

statutes had been violated. Therefore, I will analyze SA-2 from the starting position that it, too, is a valid, enforceable contract.

The BBB defendants object however not to the contracts as a whole, but to the enforcement of the separate provisions in each of the two agreements which will prohibit certain witnesses from cooperating with the BBB defendants and providing testimony at trial in this case.

"Parties to a contract . . . may agree on whatever terms they see fit so long as such terms do not violate statutory prohibitions or public policy." *Gates* at *7 (*quoting Fox v. 1010, Ltd.*, 957 P.2d 1018, 1022 (Colo. 1998). The court may void provisions of a contract under circumstances as justice mandates, however. The Federal Rules of Civil Procedure give "courts substantial discretion to craft their orders to serve the interests of justice." *Olcott v. Delaware Flood, Co.*, 76 F.3d 1538, 1555 (10th Cir. 1996); *United States v. Carrigan*, 804 F.2d 599, 603-04 (10th Cir. 1986).

There were a total of thirteen parties to SA-1.[8] No party except the Sacramento D.A. entered into a non-cooperation clause or provision. The provision, as it applies to the California investigators in this case, guarantees that these investigators will not be available as live trial witnesses in this case brought by General Steel since they are not within the range of the compulsory process of this court; their testimony can only be procured by a compelled preservation deposition – the required non-voluntary testimony.

---

[8]The majority of parties outside the three state entities and General Steele appear to be General Steel affliates.

The objectionable non-cooperation provision in SA-2 is even more restrictive than the California investigators' testimonial provision. As to the 1,333 customers who entered into SA-2 agreements with General Steel to resolve their claims rather than proceed through trial in Phase II of the Colorado AG action, they to, if outside of Colorado, are guaranteed to be unabailable as trial witnesses for the same reasons. Additionally, the 1,333 customers are prohibited from testifying pursuant to compulsory process or court order as to any facts underlying their claims, as well as to settlement amounts, conditions or negotiations as part of a confidentiality clause.

### A.  *Confidentiality*

In the context of settlement agreements, confidentiality may be of paramount concern to the parties, especially where one side fears that publicity of a settlement might encourage further litigation. Subjecting a settlement to terms of confidentiality can play an important role in allaying those concerns, thereby facilitating settlement and avoiding protracted litigation. *Stephens v. County of Albemarle,* 422 F.Supp.2d 640, 644 (W.D.Va.,2006).

In this case, the concerns of General Steel with respect to further litigation are not as significant as in some cases, however, the court does not completely discount them. General Steele had reached a public settlement with several states which involved potential payment of damages to consumers of $4 million. However, there was an option, exercised by a small percentage of claimants, to "opt out" of the settlement and pursue claims against General Steel on its own. The Colorado AG action was not a true class action suit in spite of the claim of nationwide jurisdiction. While SA-1 was intended to be a 'global resolution,' there was some concern that other states might be able to bring their own claims on their own consumer

protection statutes, just as the Sacramento District Attorney's Office had done.  (*See,* Rsp. at 20).

Therefore, this remains a factor.

However, even if confidentiality was of importance to one of the parties to a contract, the

court must still determine whether some countervailing concern dictates that parties to a

presumptively valid agreement, like the two at issue here, may not legally bind themselves in

such a manner.  *See Pierce* at 603.

Courts regularly enforce confidentiality agreements where the parties are involved in a

purely private contractual matter and the settlement is not filed with the court. *See, e.g.,*

*Stalnaker v. Novar Corp.*, 293 F.Supp.2d 1260, 1263 (M.D.Ala. 2003); *Jessup v. Luther*, 277

F.3d 926, 928 (7th Cir.2002); *Stephens* at 644.  Settlements not filed with the court do not

become a public record and, therefore, the public right of access to judicial records is not

implicated. *Jessup*, 277 F.3d at 928.  This case, of course, is a hybrid in this regard.  SA-1 was

filed as part of the public record on several occasions.  The format of SA-2 also appears to have

been submitted to the court, attached to SA-1 along with the consent decree and the preliminary

injunction.  However, each individual settling claimant negotiated different terms of settlement

of his, her or its claims presented to the Colorado Attorney General before the claimant could

receive a share of the $4,000,000 set aside by General Steel for this purpose.  Those individual

agreements were not made part of the public record of the case.

Absent a showing of compelling need, a purely private agreement among the parties to

keep the terms of the settlement and their own records confidential will be enforced.  But this is

not purely a private matter; several states had investigated General Steel and General Steel had

been found by Judge Jackson to be in non-compliance with consumer protection statutes.

Violation of consumer protection statutes is an ultimate public concern; such statutes are

designed to protect all consumers, not just those involved in one discrete litigation matter.

Exceptions to the traditional enforcement of confidentiality agreements are sometimes

made where the case is one of legitimate public interest or involves a governmental body as this

one did.  *See* Bruce A. Ericson, *Private Confidentiality Agreements*, 3 BUS.& COM. LITIG. FED.

CTS. § 30:92 (2d ed.)  "[A] promise is unenforceable if the interest in its enforcement is

outweighed in the circumstances by a public policy harmed by enforcement of the agreement."

*Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987); *Pierce v. St. Vrain Valley School Dist.*

*RE-1J*, 981 P.2d 600, 604 (Colo. 1999) (It is well-established that contracts in contravention of

public policy are void and unenforceable.).  *See, e.g., Potter v. Swinehart*, 184 P.2d 149, 151

(Colo. 1947); *Waddell v. Traylor*, 64 P.2d 1273, 1275 (Colo. 1937); *Metropolitan Life Ins. Co. v.*

*Roma,* 50 P.2d 1142, 1143 (Colo. 1935); *Russell v. Courier Printing & Publ'g Co.*, 95 P. 936,

938 (Colo. 1908).  "[T]he difficulty arises in determining whether a given contract comes within

this rule." *Russell* at 938.

One of the factors to be considered in examining confidentiality clauses is whether the

public may suffer from the confidential settlement if a defendant repeatedly causes harm and

then covers it up through confidential settlements.  *See* Heather Waldbeser and Heather

DeGrave, Note, *A Plaintiff's Lawyer's Dilemma: The Ethics of Entering a Confidential*

*Settlement*, 16 GEO. J. LEGAL ETHICS 815, 815 (2003).  Advocates of public access to

information often assume that the information contained in sealed settlements could have readily

prevented future injury. *Id.* at 819. This may not be true in most cases and does not appear to be true in this one. The injury which the public might wish to guard against in this case was fully adjudicated during a public trial and the terms of the settlement against General Steel were available to the public in SA-1. Knowledge of the exact amount of individual damages awarded to over one thousand individual claimants would not have the laudable effect of preventing a new consumer from being misled by deceptive sales practices by General Steel; presumably the provisions of the public consent decree, the preliminary injunction and the monitoring program would do that.[9]

But even when private confidentiality agreements are enforced, not all <u>factual matters</u> concerning the settled case will necessarily be muzzled; often courts will protect the terms of the settlement but will not allow a confidentiality agreement to prevent discovery directed to witnesses who can testify to otherwise admissible factual matters. *E.E.O.C. v. Astra U.S.A., Inc.*, 94 F.3d 738, 71 (1st Cir. 1996) (covenant not to assist EEOC held invalid); *Kalinauskas v. Wong*, 151 F.R.D. 363 (D. Nev. 1993); *Hamad*, 1997 WL 12955; *Wendt v. Walden University, Inc.*, 1996 WL 84668 (D. Minn. 1996); *Peterson v. Seagate*, 534 F. Supp. 2d 996, 999–1000 (D. Minn. 2008) (voiding settlement because it barred the plaintiff from filing administrative charges under the ADEA). *But see Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 456-458, (5th Cir. 2005) (holding that the mere fact that a non-disparagement clause could conceivably be used to hide illegality did not render it void as illegal or contrary to public policy).

---

[9]The BBB defendants do not challenge the confidentiality of the amounts paid to individual consumers who were parties to SA-2 agreements. (BBB Mot., Doc. No. 154, f. 11).

Courts generally do not seal, for instance, the plaintiff's allegations made in the complaint or any information in documents filed in court. However, in this case, there are no 'plaintiff's allegations in a complaint' with respect to the SA-2 customer settlement agreements. Those claimants filed their notices of claim with the Attorneys General of the several states who were prosecuting the consumer protection allegations against General Steel. Therefore, there is no information concerning the customers' specific claims against General Steel such as would normally be publically available by simply reading a complaint filed in the public court record.

In this case the confidentiality imposed on the consumers pursuant to the SA-2 agreements, whose very complaints are not publically available, prohibit the consumers from providing any testimony, even if compelled by subpoena, about the underlying facts of their claims against General Steel. Therefore, the phrase in clause number 5 of the SA-2 settlement agreements, "and the matters that are or were the subject of he, she, or its claims against General Steel" would completely muzzle all the claimants from even stating the basis for their original claims in a case where their testimony is might be critical to the BBB defendants' defense.

As noted, non-compliance with consumer protection statutes is significant matter of public concern. In this case, as the state investigations unfolded, General Steel sued various entities claiming that those entities, including the Colorado Attorney General's Office and other investigating agencies, as well as the BBB defendants and others, wrongfully caused unwarranted harm to General Steel. Even after the scathing findings in the Jackson Order that General Steel was violating consumer protection statutes, General Steel has maintained its lawsuits and its claims that others, not the conduct of General Steel itself, are responsible for the

harm to General Steel's reputation and business.  It appears to this court that the primary, if not the only reason for such a broad confidentiality agreement with respect to the settling consumers was solely to make witnesses unavailable to the entities and people General Steel blames for its legal difficulties.        This court concludes that the provision in SA-2 which prohibits a customer from truthfully testifying about the facts which led him, her or it to ultimately file a claim against General Steel in the first instance is contrary to public policy and therefore void. *See Hamad*, 1997 WL 12955, *2.  Factual testimony about events which happened prior to the customer receiving formal notice of the lawsuit and the opportunity file a claim should not be hidden from the public or the court in a case where the underlying conduct of General Steel, to a certain extent, has been tried in open court and found to be "offensive" to consumer protection statutes.  (Jackson Order at 2.)..

As noted *supra*, General Steel has a bona fide interest in the confidentiality of the amounts paid to individual claimants as part of the Phase II settlement since other claimants can bring separate actions if they so choose.  Therefore, the confidentiality of the amounts and conditions of settlement with the individual consumers does not violate public policy and may remain confidential.

### B.        Non-Cooperation Provisions.

#### 1.        Non-cooperation of California Investigators and Prosecutors.

Having found that the General Steel investigation and prosecution involves important public considerations, it is difficult to imagine a more clear cut violation of public policy than to allow a party who has been found by a court to have engaged in years of wrongdoing to their

customers the right to squelch testimony from the very people in charge of protecting the public. This court cannot fathom the rationale for the parties to have even considered agreeing to SA-1's non-cooperation agreement barring the California investigators from voluntarily and truthfully testifying in this or any other case in which they have done an investigation as part of their duty to protect their citizenry. SA-1, of course, does not contain a "confidentiality" clause; therefore, the investigators can be compelled to provide deposition testimony. But the investigators, because of their location outside this federal district, cannot be subpoenaed to appear at a trial so would have to appear voluntarily in this forum, if at all. Fed. R. Civ. P. 45. I find this restriction on law enforcement personnel, who should have an interest in providing truthful and complete factual testimony in any case where they are requested to testify so long as the investigation is not ongoing, to be contrary to public policy and therefore unenforceable. Whether or not any witness will agree to cooperate with any of the defendants in this or any other case, of course, is a decision to be made by the witness. *United States v. Pinto,* 755 F.2d 150, 152 (10th Cir. 1985) (witness has the right to refuse to be interviewed).

### 2. *Non-cooperation of Settling Customer Complainants* .

Unlike the non-cooperation agreement SA-1 imposed against members of a public entity charged with protecting the public, the customers of General Steel who signed SA-2 agreements were pursuing their private claims. The customers made allegations against General Steel which were never tested by the adversarial process of a court. In exchange for not having to prove their cases, the customers were presumably paid a sum of money. Thereafter, the customers were

relieved of the burdens of possible of appeals and lengthy periods of delay often associated with a full adjudication of claims in court.

However, very unlike most private settlements, General Steel, the payor of the settlement funds, did not apparently have a voice in which claims would be accepted or how much the claimants would be paid; the administration of the settlement process was handled entirely by the Colorado Attorney General's Office.   These were settlement agreements, then, entered into at much more than arm's length.  In essence, the entity enforcing the consumer protection laws in general was doling out money based on the Attorney General's – not General Steel's – assessment of General Steel's degree of wrongdoing with respect to the claimant and the accrued damages associated therewith.

It has not gone unnoticed by the court, as well, that the restrictions on communications with the settling consumers is a one-way street.  The defendants in the various suits brought by General Steel are prohibited from contacting the settling consumers -- or more precisely, the customers are prohibited from voluntarily responding to informal inquiries from third parties, including the BBB defendants on any matters having to do with their claims against General Steel.  However General Steel is not so precluded, even though General Steel did not negotiate with the settling customers originally and had nothing to do with the determination of whether to pay the customer's claim and, if so, in what amount.

There is no benefit to the settling customers in the non-cooperation provision.  Whether they are subject to the non-cooperation provision or not, the customers, who are not parties to this lawsuit, are free to decline to cooperate with the BBB defendants or any other party to this

case.  "As a general rule, a witness belongs neither to the [plaintiff] nor to the defense. Both sides have the right to interview witnesses before trial." *United States v. Carrigan*, 804 F.2d 599, 603 (10th Cir. 1986) (citing  *Callahan v. United States*, 371 F.2d 658 (9th Cir.1967)). Exceptions to this rule are justifiable only under the 'clearest and most compelling considerations.' *Id.* (citing *Dennis v. United States*, 384 U.S. 855 (1966)); *accord Pinto* at 152.

If any third party witness refuses to voluntarily cooperate with a party to a lawsuit, the Federal Rules of Civil Procedure contemplate appropriate procedures for compelling witnesses to provide deposition testimony which can later be admitted at trial if appropriate.   If a witness whose deposition testimony is sought refuses to testify out of concerns for confidentiality obligations, the deposing party may move to compel cooperation pursuant to Fed. R. Civ. P. 37(a)(2)(B).  The opposing party, of course, may oppose such motion or move for a protective order pursuant to Rule 26(c). *See,  e.g. Stephens* at 646; *Hamad*, 1997 WL 12955.

"The court is the protector of the purity of its own process, and may take such steps as are necessary to protect against its abuse, on its own motion, or upon the suggestion of a stranger; and neither state statutes nor ordinary procedural rules can thwart a prompt and efficacious discharge of that paramount obligation." *Pueblo De Taos v. Archuleta*, 64 F.2d 807, 812 (10th Cir. 1933).  *See also, Gumbel v. Pitkin*, 124 U. S. 131 (1888); *Zinna v. Cook*, 2008 WL 4874111, *6 (D. Colo. 2008).

The burden placed on the defendants – and only the defendants – of being required to actually take a formal deposition of 1,333 potential witnesses rather than simply contacting them by telephone first to ascertain if they are willing to voluntarily talk to the defendants and,

second, to determine if what they have to say is worthy of a trial or deposition subpoena, would result in a needless and enormous financial burden with no ascertainable benefits. The sole beneficiary of this cumbersome and expensive process would be General Steel, the entity who settled with the complaining customers as a direct result of a trial after which Judge Jackson found General Steel had "for years engaged in sales practices that were riddled with misrepresentations and omissions." ( Jackson Order at 2.)

Fed. R. Civ. P. 1, provides, "[The Federal Rules of Civil Procedure] should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." In the Colorado AG action, the consumer parties to the settlement agreements did not deal with General Steel at all in the settlement process. The SA-2 agreements were merely the method by which the apportionment of the $4 million dollar public settlement paid by General Steel was made. Given the public nature of Judge Jackson's findings against General Steel and the publically available settlement document (SA-1), as well as the only possible benefit of the non-cooperation provision with customers being to block defendants from interviewing important and potentially informative witnesses, I find the non-cooperation provisions in SA-2 agreements contrary to public policy and violative of both the spirit and the letter of the Federal Rules of Civil Procedure.

**D.** *Obstruction of Court Proceedings, Witness Tampering and Professional Conduct.*

The BBB defendants have argued that the confidentiality and non-cooperation provisions in SA-1 and SA-2 will deprive the court of live witness testimony which constitutes obstruction of court proceedings and witness tampering. Considering my findings previously set forth, I decline to address these allegations except to note that given the requirement in most criminal witness tampering and obstruction of justice statutes of "corrupt" action, in am not persuaded this argument applies in this case. *See* Stephen Gillers, SPEAK NO EVIL; SETTLEMENT AGREEMENTS CONDITIONED ON NON-COOPERATION ARE ILLEGAL AND UNETHICAL, 31 Hofstra L. Rev. 1 (2002).

It is therefore **ORDERED**:

Defendants' Motion for Determinations of Questions of Law Impacting Discovery Pursuant to Fed. R. Civ. P. 16 and the Court's Supervisory Power and Brief in Support"[Doc. No. 154] is **GRANTED** as follows:

1.      The provision in the settlement agreement designated as SA-1, Section C. 4. reading, "The Sacramento District Attorney's Office agrees that its representatives and investigators will not voluntarily appear or testify in any proceeding brought by or against any of the non-governmental Parties to this action" **is found null and void** as violating public policy and will be unenforceable in this action.

2.      The portions of the provision in the customer settlement agreements designated collective as SA-2 agreements, at Section 5, providing, "CONSUMER agrees to maintain the

confidentiality of . . . *the matters that are or were the subject of he, she, or its claims against General Steel. CONSUMER further agrees that he, she or it will not voluntarily appear or testify in any proceeding brought by or against General Steel* "**are found null and void** as violating public policy and will be unenforceable in this action.

3.       The portions of the provision in the customer settlement agreements designated collective as SA-2 agreements, at Section 5, providing, "*CONSUMER agrees to maintain the confidentiality of the terms of this Settlement and Release . . .*" **is valid and enforceable** and will be enforced in this action.

The defendants shall provide a copy of this Order to any consumer who entered into a Settlement and Release Agreement with General Steel whom they contact and from whom they attempt to obtain information relevant to this case. **The consumer who was a party to a Settlement and Release Agreement with General Steel which contained a non-cooperation and confidentiality provision involving the matters referenced herein may, in the context of this case, voluntarily cooperate with any party defendant listed in this caption <u>if they so choose</u> and will not be held to have violated the provisions of said Settlement and Release Agreement.**

It is further **ORDERED**:

4.       On or before 45 days prior to the discovery cut-off date, the defendants shall

provide a list to the plaintiff of each one of the 1,333 settling consumer witnesses they anticipate they may call as a witness at trial.

Dated this 23rd day of January, 2009.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge