# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:07-cv-01145-DME-KMT
(Consolidated with Case No. 07-cv-02170)

GENERAL STEEL DOMESTIC SALES, LLC,
d/b/a GENERAL STEEL CORPORATION, a
Colorado limited liability company,

      Plaintiff,

v.

DENVER/BOULDER BETTER BUSINESS BUREAU,
a business membership organization, *et al.,*

      Defendants.

---

## ORDER

---

      This civil case pits Plaintiff General Steel Domestic Sales, Corporation ("General Steel") against a host of Defendants that allegedly conspired to foster the false impression that General Steel was violating consumer protection laws, advertising illegally, and engaging in unfair business practices. General Steel admits, however, as it must, that the Jefferson County, Colorado District Court did find in a consumer protection action brought by the Colorado Attorney General that it had engaged in deceptive sales and advertising practices and that it eventually settled these claims with the Colorado AG for over four million dollars.

      General Steel filed its Second Amended Complaint ("SAC") on August 26, 2008, which includes several groupings of defendants: (1) the Denver/Boulder Better Business Bureau ("Denver/Boulder BBB") and individuals and entities associated with it ("the BBB

Defendants"); (2) Chip Yost, Adam Schrager, and their employer Gannett Co. d/b/a Channel 9 News ("the 9 News Defendants"); (3) Dana and Sue Beers and Kirk Jarvis ("the Nebraska Defendants" or "Beers/Jarvis Defendants"); and (4) Harold Donahue, and his employer, Steelwise LLC ("the Steelwise Defendants"). The SAC is both vauge and excessively verbose.

Before this Court are several motions. The BBB Defendants, 9 News Defendants, and Beers/Jarvis Defendants each have filed separate Rule 12(b)(6) motions to dismiss. (Doc. Nos. 165, 166, 172.) The former and current members of the board of directors of the Denver/Boulder BBB ("the BBB Director Defendants") also filed a supplemental Rule 12(b)(6) motion to dismiss. (Doc. No. 170.) Nine former and current members of the board of directors of the Denver/Boulder BBB, who are no longer named as defendants in the SAC ("the Dropped Director Defendants"), filed a motion to confirm that the filing of the SAC served as a voluntary dismissal of all claims against them. (Doc. 150.) The BBB Defendants also filed a Rule 12(f) motion to strike certain allegations in the SAC based on judicial and collateral estoppel. (Doc. No. 175.) Finally, the 9 News Defendants filed objections to the Magistrate Judge's order on 9 News' motion to stay and motion for a protective order. (Doc. 236.)

The Court grants the 9 News Defendants' and Nebraska Defendants' motions to dismiss the state law claims asserted against them. The Court also grants the BBB Defendants', 9 News Defendants', and Nebraska Defendants' motions to dismiss the federal claims asserted against them. Steelwise raised an affirmative defense to federal claims based on 12(b)(6) in its answer to the initial complaint (Doc. 21), but has not responded to the SAC. However, the defects in the SAC as to the other defendants are

equally apparent as to Steelwise as far as the federal claims are concerned. Accordingly, the Court deems Steelwise's answer to the first complaint applicable to the SAC, and dismisses the federal claims asserted against it.[1]  The Court also dismisses without prejudice all claims against the Dropped Director Defendants.  Because the Court does not have original jurisdiction over any of the remaining state law claims, the Court exercises its discretion to decline supplemental jurisdiction over the remaining state law claims.  Finally, because all claims are dismissed, and this case is dismissed in its entirety, the BBB Defendants' motion to strike and 9 News' objections to the Magistrate Judge's discovery order are moot.[2]

## I. BACKGROUND

### A. The Parties

Plaintiff General Steel sells pre-manufactured steel buildings.  The company's engineers have designed pre-fabricated steel buildings that can be used for everything from storage containers to gymnasiums to churches.  Jeffrey Knight founded General Steel in 1995.

Defendant Denver/Boulder BBB is a Colorado non-profit organization, that at all relevant times was one of approximately 126 local members of the Defendant Council of

---

[1] All claims against Donahue are dismissed based on General Steel's concession in the SAC and at the February 26 motions' hearing that it is not now asserting any further claims against Donahue.

[2]  The Court notes that if the motion to strike was not moot, it would be inclined to deny it.  Instead of attempting to strike allegations based on judicial or collateral estoppel, the proper approach should have been a motion directly attacking the merits of the claims that depended on these allegations.

Better Business Bureaus ("CBBB").  Each local BBB, including the Denver/Boulder BBB, gathers and reports information on member and non-member businesses, and coordinates its own complaint filing and data reporting.  To this effect, the Denver/Boulder BBB issues Reliability Reports which detail, inter alia, consumer complaints against a business, whether the business has resolved those complaints, and any government investigation against a business.

Defendants Jean Herman, Matt Fehling, Carrie King Rossman, and Joe Toscano are current and former employees and officers of Defendant Denver/Boulder BBB.  The SAC refers to these four defendants, collectively, as "the [BBB] Officer Defendants." (SAC ¶ 6.)

Defendants Geta Asfaw, Bowen Banbury, Darrell Brown, Toti Cadavid, Janice Campbell, Joe Conrad, Larry Dudman, Hope Marie Dunlavey, Barbara Grimm, Breckenridge Grover, Mark Johnson, Jerald Kaiser, Tony King, Donlee Lane, Tamela Lee, Jeff Metz, Rob Naish, Dean Pisciotta, Mark Renn, Craig Reynolds, Jon Robinson, Steven Salter, and Bill Stevenson are current or former members of the Board of Directors of the Denver/Boulder BBB.  The SAC refers to these defendants, collectively, as "the [BBB] Director Defendants."  (Id. ¶ 31.)  Each of these defendants served on the Board of Directors of the Denver/Boulder BBB for at least three years from 2002 to 2008.  The SAC refers to the Defendant Denver/Boulder BBB, the BBB Officer Defendants, and the BBB Director Defendants, collectively, as "the Denver/Boulder BBB Defendants."  (Id. ¶ 31.)

Defendant Kenneth Hunter is the President and CEO of Defendant CBBB. Defendants Hunter and CBBB are collectively referred to in the SAC as "the CBBB

Defendants." (Id. ¶ 33.) The CBBB Defendants and the Denver/Boulder BBB Defendants are collectively referred to as "the BBB Defendants."

Defendants Chip Yost and Adam Schrager are current or former television news reporters for Defendant Gannett Co, Inc. ("Gannett" or "9 News"). Gannett owns and operates KUSA-TV in Colorado. Collectively, Yost, Schrager, and 9 News are referred to in the SAC as "the 9 News Defendants." (Id. ¶ 36.)

Defendants Dana and Sue Beers are residents of Nebraska and were former customers of General Steel. They contracted with the plaintiff to purchase two steel buildings in April 2003. Defendant Kirk Jarvis, also a resident of Nebraska, is an acquaintance of the Beers.

Defendant Steelwise, LLC ("Steelwise") is a competitor of General Steel in the steel building industry, and is currently in receivership. Defendant Harold G. Donahue was originally employed by General Steel, but left General Steel's employ to found Steelwise. Donahue has filed for bankruptcy and "no relief is sought against him at this time." (Id. ¶ 37.)

Although at the center of this controversy, the Colorado Attorney General's Office is not a named defendant, because General Steel executed a Settlement Agreement with the AG's Office which included a release of all claims General Steel had against that office.

**B. General Steel's Second Amended Complaint**

The SAC is 86 pages in length and contains 426 paragraphs, detailing a long-running business dispute between the Denver/Boulder BBB and General Steel. The dispute started with the Denver/Boulder BBB's suspension in February 2003 of General

Steel's membership in the Denver/Boulder BBB, and culminated with the Denver/Boulder BBB's referral of General Steel to the Colorado AG's Office for prosecution. Along the way, the SAC details an evolving conspiracy that developed to take down General Steel, enlisting the efforts of the Colorado Attorney General's Consumer Protection Section, a TV station, two of its reporters, three folks from Nebraska, including two of General Steel's former disgruntled customers, and a competing steel company and its chief executive. Because the SAC is being challenged on motions to dismiss, the court must still accept as true all well-pleaded factual allegations in the complaint and construe such allegations (and any reasonable inferences that might be drawn from them) in the light most favorable to General Steel. See Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007).

In brief, General Steel's dispute with the Denver/Boulder BBB commenced when the BBB improperly suspended General Steel's membership, even though General Steel had years of satisfactory ratings and a declining number of complaints as a percentage of total transactions. The BBB lifted General Steel's suspension on March 5, 2003, but five days later, it declared General Steel in violation of the BBB Code of Advertising, even though General Steel had only received three advertising complaints in the past three years. At the same time, the Denver/Boulder BBB published false and misleading statements on its website about General Steel's advertising practices. For instance, General Steel alleges that the Reliability Reports on General Steel "falsely suggest[ed] that General Steel['s] transactions involved eight types of 'hidden costs.'" (SAC ¶ 145.) As a result, General Steel resigned its membership in the BBB on March 17, 2003.

On March 25, 2003, the Denver/Boulder BBB "retaliated by falsely identifying General Steel" to the Colorado AG's Office "as the '#1 company' [thought to be committing fraud] out of fourteen purportedly 'revoked' as BBB members." (Id. ¶ 147.) The Denver/Boulder BBB regularly communicated with the Colorado AG's Office regarding consumer complaints it received under a contractual relationship it had with the AG's Office forming the Colorado Consumer Line. Pursuant to the contractual relationship between the Denver/Boulder BBB, the Colorado AG's office entrusted the Denver/Boulder BBB with certain duties, including receiving and inventorying consumer complaints, and providing monthly reports of "patterns" and "pertinent information of interest" to be "'used' by the Attorney General's [Consumer Protection Section] to help target individuals and businesses engaging in patterns and practices of fraud." (Id. ¶¶ 95-96.) The Denver/Boulder BBB also "created a software program that allowed the [AG's] Consumer Protection Section to have instant access to BBB files, and participated in monthly telephone conferences during which [the BBB] identified companies it had determined were engaged in 'fraud.'" (Id. ¶ 98.) The contract also provided that the Denver/Boulder BBB and the Colorado AG would "work cooperatively to coordinate efforts in working with the media." (Id. ¶ 105.) The Denver/Boulder BBB received compensation for its services under the contract.

The Denver/Boulder BBB urged the Colorado Attorney General's Office to initiate enforcement proceedings against General Steel. The Colorado Attorney General subsequently began an investigation into General Steel's business practices, and joined the Denver/Boulder BBB's conspiracy to take down General Steel. At this same time, the Denver/Boulder BBB continued its own enforcement efforts against General Steel

The BBB continued to publish "false and misleading statements" in General Steel's Reliability Reports "concerning a purported 'pattern' of complaints, and General Steel's purported 'failure to correct the underlying reason' for the complaints." (Id. ¶ 153.) In order to substantiate these false reports, Denver/Boulder BBB VP Fehling directed BBB employees to alter dozens of complaint codes on consumer complaints submitted against General Steel in order to increase the number of consumer complaints related to "advertising, sales, and delivery" issues. The Denver/Boulder BBB published this false information with the intent to "cause negative customer reaction, assist the Colorado AG's Office, and harm General Steel." (Id.)

The Denver/Boulder BBB also instituted, in April 2003, an enforcement proceeding with the National Advertising Division ("NAD") of the CBBB for nine violations of the BBB Code of Advertising. The Denver/Boulder BBB and the CBBB obtained General Steel's voluntary compliance in the self-regulatory NAD proceeding by threatening General Steel with referral to the Federal Trade Commission. The NAD Procedures and Participation Agreement required General Steel and the Denver/Boulder BBB to "keep the [NAD] proceeding confidential throughout the [NAD] process"; to "not . . . mischaracterize any NAD . . . case decision"; and, to not use and disseminate any NAD Case Decision "for any advertising and/or promotional purposes." (Id. ¶¶ 157-58, 391.) The Denver/Boulder BBB disregarded these commitments and continued to publish false and misleading statements in the Reliability Reports.[3]

_____

[3] The Reliability Reports included comments, inter alia, regarding: "a purported 'volume and pattern' of complaints [against General Steel]"; "that customers had experienced 'a range of problems, primarily about how the company's product is advertised"; the General Steel's products included "hidden costs"; and, that General

Additionally, VP Fehling distributed information concerning the confidential proceedings to the Colorado Attorney General's Office and gave two interviews to 9 News (in August and November 2003) concerning the confidential NAD proceeding and the NAD Case Decision, during which he made false and misleading statements.

It is at this point, that the scope of General Steel's conspiracy starts widening, and 9 News enters the plot through its false, misleading and disparaging television broadcasts and website news articles, which were intended to harm General Steel. 9 News broadcast four stories concerning General Steel, three reports by Mr. Yost on August 6, 2003, November 12, 2003, and January 16, 2004, and one report by Mr. Schrager over three years later on August 13, 2007. 9 News re-published those broadcasts on its website as articles, which are still accessible to this day.. General Steel alleges that the 9 News Defendants knew that the information they were publishing concerning General Steel was false. Also, the 9 News reporters' techniques sandbagged General Steel by not providing General Steel with a fair opportunity to respond.

On January 16, 2004, the Colorado AG's Office's investigation of General Steel culminated in the filing of a consumer protection lawsuit against General Steel in Jefferson County District Court.[4] As part of the consumer protection litigation, in March 2004, the Colorado Attorney General sought a preliminary injunction against General

_____

Steel does not manufacture its own buildings. (Id. ¶ 156.)

[4] On that same date, General Steel filed its own lawsuit in state court against the Denver/Boulder BBB, Denver/Boulder BBB CEO Herman, and Denver/Boulder BBB VP Fehling.

Steel.  Dana and Sue Beers, along with Kirk Jarvis, allegedly joined the conspiracy at this stage.  General Steel first had contact with Dana and Sue Beers in April 2003.  At that time, the Beers contracted with General Steel to purchase two steel buildings.  The Beers breached the contract for the buildings, but nonetheless demanded the return of their deposit.  After General Steel balked at this demand, the Beers decided to plot to provide the Colorado AG with a witness whose testimony would bolster the Colorado AG's case for a preliminary injunction against General Steel.  The Beers enlisted Kirk Jarvis for this task, and convinced him to contact General Steel, pretending to be a consumer interested in purchasing a steel building.  Thereafter, Jarvis agreed to claim falsely that a General Steel sales representative had employed deceptive advertising or sales techniques during the sales conversation.  Jarvis did just that, and reported the particulars of the conversation, including the allegedly false claims about General Steel's deceptive sales practices, to the Colorado AG.  Jarvis spoke with Colorado AG Consumer Protection Section employees Jay Simonson and Mike Langley, and instead of rejecting Jarvis's testimony, attorneys for the Colorado AG eventually called Jarvis to testify by telephone during the Jefferson County District Court hearing regarding the Colorado AG's motion for a preliminary injunction against General Steel's deceptive sales practices.  This testimony precipitated General Steel's decision to enter a stipulated preliminary injunction.  General Steel alleges, however, that the conduct which was enjoined simply "was not occurring." (Id. ¶ 171.)

During the lead-up to trial, the conspiracy targeting General Steel became even more bloated when Donahue entered the scene.  Donahue was General Steel's former CFO.  While employed at General Steel, he had signed non-compete and non-

disclosure agreements, but nonetheless he secretly planned a competing steel building business, Steelwise, which he formed in August 2004 with Eric Morgenthaler, who was General Steel's former Chief Operations Manager.  Donahue and Morgenthaler gave the Colorado AG's Office a CD-ROM containing a comprehensive database of all General Steel customers, which was originally prepared for use by General Steel's counsel in litigation, as well as tax information stolen from General Steel.  The Colorado AG's acquisition of this stolen information was eventually brought to the Jefferson County District Court's attention, and evidentiary sanctions were entered against the AG's Office.

The Colorado Attorney General's litigation against General Steel proceeded to trial in the fall of 2004.  Colorado amended its lawsuit to seek recovery for all nationwide plaintiffs, and the court bifurcated the trial into two phases.  Phase I was a "test" phase which included eleven (11) customers made available by the AG, and Phase II would be the opportunity to present claims of other customers.  On December 7, 2004, the Jefferson County District Court "issued a non-final order concerning the Phase I test trial."  (Id. ¶ 179, 182.)  The order concluded that "portions of General Steel's sales script contained inaccurate statements" and that eight of the eleven Phase I customers should receive restitution as a result.  (Id.)  The order, however, acknowledged that just because the Attorney General prevailed in Phase I did not mean that it would be able to find customers that were also harmed by General Steel in order to prevail in Phase II.

On August 16, 2005, the Jefferson County Court issued an order establishing the procedures governing Phase II, ruling that any customer who placed a deposit on a building in the last three years could potentially participate if they responded to a

questionnaire.  The Denver/Boulder BBB inappropriately publicized information about this order and other matters concerning the Colorado AG's Office's consumer protection litigation against General Steel, in order to drum up additional claimants and disparage General Steel.  Ultimately, on July 7, 2006, the Colorado AG and General Steel reached a settlement agreement requiring General Steel to pay $4,500,000 in damages. General Steel alleges that "[t]he settlement was driven by the inflated expense caused by the inflation of claims caused by the [BBB's] reporting practices."  (<u>Id.</u>)

Since the filing of this current lawsuit, General Steel has suffered no respite from the conspiracy, as the Denver/Boulder BBB continues to publish false and misleading information in its Reliability Reports on General Steel.  Also, it was the victim of more false and misleading media coverage after the Beers'/Jarvis' counsel, Colorado State Senator Shawn Mitchell, and the Colorado AG's Office "solicitated [sic] their 9 News partner and co-defendant to generate even more negative publicity concerning General Steel, this pending litigation, and their contemplated 'legislation' [to shield the defendants from liability]."  (<u>Id.</u> ¶ 318.)


## II.  MOTION TO DISMISS

General Steel asserts five federal claims for relief against all of the defendants: (1) a 42 U.S.C. § 1983 claim for the violation of General Steel's Fourteenth Amendment rights to equal protection of the laws; (2) a § 1983 claim for the violation of General Steel's Fourteenth Amendment due process rights; (3) a § 1983 conspiracy claim; (4) a 18 U.S.C. § 1961 claim for Racketeer Influenced and Corrupt Organizations Act ("RICO") violations; and, (5) a RICO conspiracy claim.  General Steel also asserts six

state law claims for relief against all or some of the defendants: (6) a Colorado Consumer Protection Act claim against the BBB Defendants; (7) a breach of contract claim against the Denver/Boulder BBB; (8) a breach of the covenant of good faith and fair dealing claim against the Denver/Boulder BBB; (9) an interference with contractual relations claim against all defendants; (10) a claim for interference with prospective business advantage claim against all defendants; (11) a claim for fraud against the Denver/Boulder BBB, Herman, Fehling, the Beers, Jarvis, and Steelwise.

The 9 News Defendants, BBB Defendants, and Nebraska Defendants each filed Rule 12(b)(6) motions to dismiss challenging the five federal claims. The 9 News Defendants' and Nebraska Defendants' motions to dismiss also challenged the state law claims, while the BBB Defendants' motion to dismiss requested the Court to simply decline to exercise supplemental jurisdiction over the state law claims asserted against them. This Court will initially consider the challenges to the state law claims and then proceed to the federal law claims. As the motions to dismiss raise similar issues, where appropriate, they will be considered together.

In ruling on a Rule 12(b)(6) motion, this court must determine whether the complaint "contains enough facts to state a claim to relief that is plausible on its face." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1969 (2007)). As such, the "complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." Id. If the allegations in the complaint "are so general that they encompass a wide swatch of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from

conceivable to plausible.'" Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)

(quoting Twombly, 127 S.Ct. at 1974). Nonetheless, this new "plausibility" standard

does not depart entirely from earlier standards for deciding 12(b)(6) motions. The court

must still accept as true all well-pleaded factual allegations in the complaint and

construe such allegations (and any reasonable inferences that might be drawn from

them) in the light most favorable to the plaintiff. Robbins, 519 F.3d at 1247.


III. STATE LAW CLAIMS

    A. Claims against Nebraska Defendants

    General Steel asserts three state law claims against the Nebraska Defendants: a

claim for (1) interference with contractual relations, (2) interference with prospective

contractual relations, and (3) fraud. General Steel cannot prevail on either of its claims

against the Nebraska Defendants for interference with contractual relations or

prospective contractual relations, because there are no indications in the complaint that

they intended their communications with the Colorado AG's office and the Jefferson

County District Court to interfere with any of General Steel's contracts or prospective

contractual relationship. See Westfield Dev. Co. v. Rifle Inv. Assocs., 786 P.2d 1112,

1117 (Colo. 1990) (Interference "must . . . be both intentional and improper" to support a

claim for tortious interference with contract). Furthermore, General Steel has not

alleged any contracts or prospective contracts that were interfered with as a result of the

Nebraska Defendants' actions.

    General Steel's fraud claim is based on Jarvis's alleged misrepresentation to the

company's sales representative that he was interested in purchasing a pre-fab steel

building from General Steel.  General Steel argues that had Jarvis truthfully represented

that he had no interest in purchasing a pre-fab steel structure, and that his true intent

was to "concoct a false story about the sales call, which he then intended to provide to

the Colorado AG, and then intended to testify falsely about at the upcoming hearing," it

would have terminated the phone call.  (General Steel's Response to Beers/Jarvis

Motion to Dismiss, Doc. 216 at 18.)   Instead, "General Steel['s] salesperson talked to

Mr. Jarvis — and got set up."  (Id. at 19.)

General Steel cannot prevail on its fraud claim for two reasons.  First, General

Steel has not alleged any sort of justifiable reliance that the law will recognize.  The law

will not recognize justifiable reliance when the claim is that General Steel would not

have attempted to defraud Mr. Jarvis if it had known he was not a bona fide buyer.[5]

Second, General Steel has not alleged that it suffered any damage from Jarvis's alleged

misrepresentation.  See Western Cities Broadcasting, Inc. v. Schueller, 849 P.2d 44, 48

(Colo. 1993) (actual damages are a necessary element of the plaintiff's cause of action

in fraud).  Although Jarvis eventually did testify at the Jefferson County District Court's

preliminary injunction hearing about the content of the sales call, General Steel did not

suffer any damage from his testimony at the hearing, because it *voluntarily* entered into

a stipulated preliminary injunction.

Therefore, for the foregoing reasons, all of the state law claims against the

Beers/Jarvis Defendants are DISMISSED.

---

[5] General Steel's fraud claim, of course, must be premised on the claim that its
sales person engaged in deceptive sales practices against Mr. Jarvis, which it would not
have done if it had know Mr. Jarvis was not interested in purchasing a steel building.
Otherwise, how else could General Steel's sales representative have been "set up" ?

B. Claims against 9 News Defendants

General Steel asserts two state law claims against the 9 News Defendants: a claim for (1) interference with contractual relations, and (2) interference with prospective contractual relations. Initially, the Colorado statute of limitations for these torts is two-years. Colo. Rev. Stat. § 13-80-102(1)(a); see also U.S. ex rel. Conner v. Salina Regional Health Center, Inc., 543 F.3d 1211, 1224-25 (10th Cir. 2008) ("When determining whether state law claims are timely commenced, [federal courts] look to state law."). An affirmative defense based on a statute of limitations can be resolved on a Rule 12(b)(6) motion to dismiss if the relevant facts are clear from the face of the complaint. See Aldrich v. McCulloch Prop. Inc., 627 F.2d 1036, 1041 (10th Cir. 1980). All of Mr. Yost's activities occurred more than two years before the filing of General Steel's first complaint against him: the last date of any alleged unlawful conduct by Mr. Yost is either November 12, 2003 or January 16, 2004 (it is unclear whether General Steel alleges any unlawful conduct related to Mr. Yost's January 16, 2004 broadcast), and General Steel's action against Mr. Yost was not commenced until February 26, 2006. (See General Steel Domestic Sales v. Suthers, et al., No. 2:06-cv-00411-LKK-KJM, (E.D. Cal.)). As it is clear from the face of the complaint that all of former 9 News reporter Chip Yost's alleged activity occurred more than two years before the filing of the complaint,[6] the state law tort claims against Mr. Yost are time-barred.[7]

---

[6] General Steel's argument that the continuing wrong doctrine is applicable to allow it to challenge Mr. Yost's activities even though they occurred more than two years before the filing of the complaint, because 9 News has continued to maintain website articles of Mr. Yost's broadcasts on the internet, is unavailing. General Steel has not alleged that Mr. Yost had any involvement in the continuing publication of his broadcasts on 9 News's website. In so much as the continuing wrong doctrine has any

Additionally, General Steel cannot prevail on either of its claims against Adam Schrager or 9 News for interference with contractual relations or prospective contractual relations, because the complaint does not allege that Adam Schrager or 9 News intended to interfere with any of General Steel's contracts or prospective contractual relationships, or that their conduct was improper.  See Westfield Dev. Co., 786 P.2d at 1117.  Furthermore, General Steel has not alleged any contracts or prospective contracts that were interfered with as a result of Schrager's or 9 News's actions.

Therefore, for the foregoing reasons, all of the state law claims against the 9 News Defendants are DISMISSED.


## IV. FEDERAL LAW CLAIMS

### 1. The § 1983 Claims

The motions to dismiss, collectively, focus on four distinct defects regarding the section 1983 claims: the absence of state action, the absence of any alleged personal participation in the alleged constitutional violations, and the failure to allege a constitutional violation under either the equal protection clause or the due process clause.[8]  Any one of these defects is sufficient, by itself, to cause General Steel's claims

---

validity to this cause of action (and General Steel has offered no citations to any Colorado case to support this proposition), it does not allow General Steel to challenge *Mr. Yost's* reporting and broadcasting activities because *9 News* decided to continue publishing his old broadcasts on its website.

[7] Thus, General Steel's allusion to one contract that Mr. Yost allegedly attempted to interfere with between June and August of 2003 is time-barred.

[8] The motions to dismiss also raise several other potential defenses to General Steel's claims.  The Court notes that it is likely that the statute of limitations bars at least

to fail.

The Court will initially consider the color of law requirement and the personal participation requirement under section 1983, as these requirements are applicable to all of the section 1983 claims. Then, the Court will focus on the specific constitutional violations alleged in the complaint.

### a. State Action

"In order to state a 42 U.S.C. § 1983 claim, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." B.Willis, C.P.A., Inc. v. BNSF Ry. Corp., 531 F.3d 1282, 1305 n.27 (10th Cir. 2008) (quotation omitted). Because all of the defendants in this case are private actors, this court must first determine whether they nevertheless acted "under color of law" for purposes of 42 U.S.C. § 1983. Liability cannot attach unless the actions of the private parties rise to the level of state action. See, e.g., Darr v. Town of Telluride, 495 F.3d 1243, 1256 (10th Cir. 2007). This requirement delimits the imposition of liability to situations where the "State is responsible for the specific conduct of which the plaintiff complains." Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n , 531 U.S. 288, 295 (2001). "Thus, the only proper defendants in a Section 1983 claim are those who represent [the state] in some capacity, whether they act in accordance with their authority or misuse it." Gallagher v. "Neil Young Freedom Concert", 49 F.3d 1442, 1446

_____

some of the claims against some of the defendants, but it is unnecessary to reach this issue given the alternative grounds for dismissal in this order. Also, the Court recognizes that the BBB Director Defendants raised the defense of volunteer immunity under the Volunteer Protection Act, but it is also unnecessary to decide this argument.

(10th Cir. 1995) (quotation omitted).  Accordingly, the court must decide whether the actions of each defendant can be considered state action.

Application of the state-action doctrine "frequently admits of no easy answer." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974).  The Supreme Court has articulated four different tests for determining whether a private party's actions are "fairly attributable" to the state.  Lugar v. Edmondson Oil Co., 457 U.S. 922, 928, 937 (1982). The Court has considered  "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself."  Jackson, 419 U.S. at 351.  Second, the Court has analyzed whether "the state has 'so far insinuated itself into a position of interdependence' with the private party that there is a 'symbiotic relationship' between them."  Gallagher, 49 F.3d at 1447 (quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961); Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 175 (1972)) (citations omitted).  Third, the state action requirement is satisfied if a private party is "a willful participant in joint activity with the State or its agents."  Id. (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970)).  Lastly, the state action doctrine is satisfied if a private party exercises "powers traditionally exclusively reserved to the State."  Jackson, 419 U.S. at 352.

"Under each of these four tests, 'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" Gallagher, 49 F.3d at 1447 (quoting Lugar, 457 U.S. at 937).  The Supreme Court has not held "[w]hether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a

situation."  Lugar, 457 U.S. at 939.

### i. Nebraska Defendants

General Steel's claims against the Nebraska Defendants arise from the alleged

Beers/Jarvis conspiracy to have Jarvis testify for the Colorado AG's office at a

preliminary hearing.[9]  General Steel alleges that Dana and Sue Beers, despite their own

breach of the parties's contract to buy a pre-fab steel building, retaliated against

General Steel by conspiring with Kirk Jarvis to supply the Colorado AG with a witness

for its enforcement action against General Steel.  After Jarvis spoke with a General

Steel representative, the Beers and Jarvis "concocted a false story concerning the sales

call [with General Steel] and communicated it to [Consumer Protection Section Deputy

Attorney General Jay] Simonson and [Investigator Mike] Langley by telephone ."  (SAC

¶ 272.)  Thereafter, the Beers, Jarvis, Simonson, Langley, and First Deputy Attorney

General Berkenkotter (on behalf of the Colorado AG office) "conspired to have Jarvis

give his perjurious [sic] testimony at [a later] hearing" in the enforcement action against

General Steel.  (Id. ¶ 273.)  "Berkenkotter and Simonson . . . knew, should have known,

_____

[9]  As an after thought, General Steel also asserts, in its response to the Nebraska
Defendants' motion to dismiss, that the Nebraska Defendants are liable for their
counsel's, State Senator Mitchell's, participation and instigation of the August 13, 2007,
news story broadcast by 9 News regarding the Colorado state legislature's
"contemplation" of legislation to shield defendants from liability. In so far as General
Steel asserts a claim based on Sen. Mitchell's contacts with 9 News, General Steel fails
to plausibly allege that Sen. Mitchell's actions are fairly attributable to either the State or
the Nebraska Defendants.  First, General Steel does not allege that Sen. Mitchell was
acting as the Beers/Jarvis's counsel, as opposed to as a legislator, when he made the
alleged comments to 9 News; therefore, it is not clear that Sen. Mitchell's claims can
fairly be attributable to his clients, the Nebraska Defendants.  However, even if
Sen. Mitchell was talking to the media as the Beers/Jarvis's defense counsel, it is
implausible that comments made for the benefit of mounting a defense for his clients
could be attributable both to his clients *and* the State of Colorado.

or were deliberately indifferent to the fact that Jarvis would perjure himself, and that Jarvis' testimony would cause the Court to form a negative reaction [to General Steel's sales practices.]" (Id. ¶ 274.)   General Steel avers that its private investigator confirmed the presence of a conclusory conspiracy in interviews with the Beers, Jarvis, and others, after the preliminary injunction hearing, which "revealed that the Beers/Jarvis Defendants had, in fact, conspired to have Jarvis testify falsely."  (Id. ¶ 278.)

In sum, then, General Steel's allegations against the Beers defendants amount to (1) the assertion that they conspired with Jarvis (a private party), (2) they communicated the contents of Jarvis's phone call to employees of the Colorado AG's office, Simonson and Langley, and (3) they further conspired with Jarvis to have him testify at a later proceeding.  The Nebraska defendants' alleged actions cannot be viewed as actions of the state itself.  General Steel never alleges that the Colorado AG coerced Jarvis into testifying falsely.  In fact, the complaint credits Dana and Sue Beers with the scheme's inception.  Moreover, General Steel does not assert that the Colorado AG provided significant encouragement, recognizing instead that the Beers played the role of Iago.

Although the complaint often repeats the refrain that the Nebraska defendants "conspired" to harm General Steel, it rarely bolsters these conclusions with supporting factual allegations.  Aside from Jarvis's call to General Steel, General Steel points to no indicia of such a conspiracy.  Similarly, the only factual nugget offered as evidence of the conspiracy between the Beers, Jarvis and the Colorado Attorney General's Office is that Jarvis testified at the preliminary injunction hearing.  Between Jarvis's alleged call to General Steel and his testimony, General Steel asks the court to connect the dots via a circuitous, implausible route.  Why would the AG's Office, though its attorneys

allegedly knew or should have known that Jarvis's statements were false, proffer

Jarvis's testimony?  And why would the Beers remain involved in the alleged conspiracy

between Jarvis and the Attorney General's Office?  Conspicuously lacking from the

complaint is any factual filler.

Finally, the Tenth Circuit has held repeatedly that citizens who complain to law

enforcement officers and thereby precipitate an arrest are not state actors.  See Carey

v. Continental Airlines Inc., 823 F.2d 1402 (10th Cir. 1987); Lee v. Town of Estes Park,

820 F.2d 1112 (10th Cir. 1987).  In the same vein, registering a consumer complaint

with a state consumer protection agency, without more, is insufficient to cast private

action as state action.  Here, General Steel alleges that Jarvis in effect complained to

Simonson and Langley, and that the Colorado Attorney General's Office acted on

Jarvis's statements.  But the complaint does not, aside from several conclusory

assertions, tie the employees of the Consumer Protection Section to Jarvis in a way that

would allow the court to discern concerted action.  See Gallagher, 49 F.3d at 1453-54

("[T]he mere acquiescence of a state official in the actions of a private party is not

sufficient.  . . .  [S]tate action may be found if a state actor has participated or influenced

the challenged decision or action.")   Although the Carey court implied that the result

might have differed had there been evidence of "concerted action, whether conspiracy,

prearranged plan . . . or policy" linking the police and the private party,  Carey, 823 F.2d

at 1404, the court must still seek some specific factual support for allegations of

conspiracy.  No such facts appear in the complaint.

Therefore, when propped up next to the plausibility standard, the meager factual

allegations in the complaint do not suggest that the Nebraska Defendants' actions are

"fairly attributable" to the Colorado AG's Office under either the nexus test, symbiotic relation test, or joint action test.[10]

As a result, General Steel cannot prevail on any of its § 1983 claims against the Nebraska Defendants because of the failure to adequately allege state action.

### ii. 9 News Defendants

General Steel's claims against the 9 News Defendants arise from 9 News and its reporters' alleged conspiracy to broadcast reports and publish articles that disparage General Steel. General Steel's allegations against the 9 News Defendants amount to the following: (1) that 9 News Defendants received documents and interviews from governmental officials and the Denver/Boulder BBB (a private party), (2) that 9 News had a "media partnership" with the Denver/Boulder BBB (a private party), (3) that the Denver/Boulder BBB (a private party) and/or the Consumer Protection Section provided 9 News with questions to ask General Steel — which questions General Steel declined to answer, (4) that the Denver/Boulder BBB (a private party) contacted General Steel customers to encourage them to talk with 9 News, and (5) that 9 News's broadcasts were intended to assist the Colorado AG's enforcement proceedings against General Steel. Importantly, the allegations focus more on an alleged relationship between 9 News and the Denver/Boulder BBB (a private party) than they do on the relationship between 9 News and the Colorado Attorney General.

These allegations essentially amount to a conclusion that the Colorado AG's

---

[10] General Steel has not claimed that the Nebraska Defendants exercised powers traditionally reserved to the state. (See General Steel's Response to Beer/Jarvis's Motion to Dismiss at 10.)

Office was a good source for 9 News.  The Tenth Circuit has held that "[w]ithout more, a reporter does not become a state actor, however, simply because she has received and published information from a governmental official."  Anderson v. Suiters, 499 F.3d 1228 (10th Cir. 2007).  Here, the only allegation of something "more" is that former 9 News reporter Adam Yost once asked questions of General Steel that were provided by the Denver/Boulder BBB and/or Consumer Protection Section.[11]  This, however, is insufficient to establish an agreement and concerted action for 9 News to act on behalf of the State of Colorado.  But even if this were sufficient to establish some sort of concerted action, it is not a sufficient allegation that the Colorado AG's office and 9 News acted in concert in the publication of 9 News's broadcasts.  Importantly, General Steel has failed to allege that the Colorado AG's office exercised any coercive power over 9 News or shaped the content of 9 News's coverage.  Cf. Breger v. Hanlon, 129 F.3d 505 (9th Cir. 1997), *vacated and remanded by*, 526 U.S. 808 (1999), *judgment reinstated by* 188 F.3d 1155 (9th Cir. 1999) (CNN's filming of federal agents as they executed a search warrant of a Montana ranch was state action, wherein federal agents "planned and executed the search in a manner designed to enhance its entertainment, rather than its law enforcement value.").

Therefore, the factual allegations in the complaint do not suggest that 9 News's broadcasts are "fairly attributable" to the Colorado AG's Office under either the nexus

---

[11]  Specifically, General Steel alleges that "Yost . . . submitted questions [to General Steel] that were identical to those being asked of General Steel in confidential depositions being conducted by the Consumer Protection Section pursuant to administrative subpoenas.  It was apparent such questions had been provided to Yost by the Denver/Boulder BBB and/or Consumer Protection Section."  (SAC ¶ 223.)

test, symbiotic relation test, or joint action test.[12]

As a result, General Steel cannot prevail on any of its § 1983 claims against the 9 News Defendants because of the failure to adequately allege state action.

### iii. BBB Defendants

General Steel's claims against the BBB Defendants arise from the Denver/Boulder BBB's suspension of General Steel's membership, the Denver/Boulder BBB's enforcement of the BBB Code of Advertising against General Steel, the commencement of NAD proceedings against General Steel, the referral of General Steel to the Colorado AG's Office for prosecution, and the publication of false and misleading statements concerning General Steel in order to harm General Steel and encourage consumer participation in the AG's consumer protection action against General Steel.

General Steel, however, has failed to allege that the Colorado AG's Office "has exercised coercive power or . . . provided significant encouragement, either overt or covert, that the [BBB Defendants' actions] must in law be deemed to be that of the State. Gallagher, 49 F.3d at 1448 (quoting Blum v. Yarektsy, 457 U.S. 991, 1004 (1982)). The Denver/Boulder BBB's dispute with General Steel pre-dated the involvement of the Colorado AG's Office, and the Colorado AG's "[m]ere approval or acquiescence in the initiatives of a private party" will not suffice to convert the private

---

[12] General Steel has not claimed that the 9 News Defendants exercised powers traditionally reserved to the state. (See General Steel's Response to 9 News Defendants' Motion to Dismiss at 20-23.)

party's action into state action.[13]  Rendell-Baker v. Kohn, 457 U.S. 830, 1004-05 (1982).

Nor will the Denver/Boulder BBB's recommendation to the Colorado AG's Office to

prosecute General Steel cast the BBB's private action as state action.  Cf. Carey, 823

F.2d at 1404 (citizens who complain to law enforcement officers and thereby precipitate

arrest are not state actors).  Additionally, the Denver/Boulder BBB's mere

recommendation to prosecute General Steel is not a "power[] traditionally exclusively

reserved to the State" such that the BBB's action can be considered state action.

See Jackson, 419 U.S. at 352.  Importantly, General Steel never alleges that the

Colorado AG's Office delegated prosecutorial discretion to the Denver/Boulder BBB

such that the Denver/Boulder BBB had any more of a role than merely recommending

prosecution — and, of course, any private party can recommend to the State that it

prosecute a company for deceptive sales and advertising practices.

Even though the Denver/Boulder BBB received significant state funds to review

and advise the Consumer Protection Section concerning consumer complaints as part

of the contractual relationship forming the Colorado Consumer Line, this is not sufficient

to cast the BBB's private action as state action.  See Rodrigues,  293 F.3d at 1204

(quoting Gallagher, 49 F.3d at 1451) ("[E]xtensive state regulation, the receipt of

substantial state funds, and the performance of important public functions do not

necessarily establish the kind of symbiotic relationship between the government and the

_____

[13]  General Steel has drawn the Court's attention to an alleged excerpt of the
BBB and Colorado AG's contract, which states the parties would "work cooperatively to
coordinate efforts in working with the media."  (SAC ¶ 105.)  General Steel, however,
does not allege that the Colorado AG exercised coercive power or significantly
encouraged the BBB's interaction with the 9 News, such that it would transform the
AG's role from merely approving or acquiescing in the BBB's publicity efforts.

private entity that is required for state action."). Although General Steel alleges that the Denver/Boulder BBB was motivated to encourage claimants to participate in the AG's enforcement action against General Steel by a desire to recover part of the AG's eventual settlement, General Steel does not allege that the Denver/Boulder BBB's contract with the AG's Office provided the BBB with a portion of any recovery from an action it recommended prosecution in, and General Steel does not allege that the BBB received any portion of the $4.5 million settlement with General Steel.[14] Thus, the sole factually specific link between the Denver/Boulder BBB and the Colorado AG's actions, other than conclusory allegations of conspiratorial behavior, is the contractual relationship between the Colorado AG and the Denver/Boulder BBB. This factual acorn cannot plausibly support the oak of a symbiotic relationship or joint action between the Denver/Boulder BBB and the Colorado AG's Office that General Steel alleges.

Therefore, the factual allegations in the complaint do not suggest that the Denver/Boulder BBB's actions are "fairly attributable" to the Colorado AG's Office under either the nexus test, symbiotic relation test, joint action test, or traditional state powers test.

Nonetheless, because the BBB Defendants arguably conceded, for purposes of their 12(b)(6) motion, that they engaged in state action so that they could attempt to raise the defense of qualified immunity, the Court does not rely on General Steel's

---

[14] General Steel, however, did allege that in 2003 (before the AG had begun investigating General Steel) that the Denver/Boulder BBB renegotiated its original contract with the Colorado AG to get more money. General Steel alleged that this increased payment came from funds the AG recovered from consumer protection action settlements, including a consumer protection action against Qwest that the BBB claimed to have helped make possible.

failure to adequately allege state action as a ground for dismissal of the § 1983 claims against the BBB Defendants.[15]

### b. <u>Supervisory Liability</u>

Even if state action existed, General Steel's § 1983 claims against the BBB Director Defendants and CBBB Defendants must fail because General Steel has not alleged that these defendants personally participated in any unconstitutional acts. A plaintiff asserting a § 1983 claim must allege that each particular defendant personally participated in the unconstitutional actions. <u>See</u> <u>Mitchell v. Maynard</u>, 80 F.3d 1433, 1441 (10th Cir. 1996) ("[P]ersonal participation is an essential allegation in a § 1983 claim.") (internal quotation omitted). There is no respondeat superior liability under § 1983: "[s]upervisors are not strictly liable for the torts of their underlings; instead, they are liable only when they personally participated in the alleged violation." <u>Bryson v. Gonzales</u>, 534 F.3d 1282, 1289 (10th Cir. 2008) (quotation omitted). To state a claim a plaintiff must allege "a deliberate, intentional act by the supervisor to violate constitutional rights." <u>Id.</u> (quotation omitted). There must, therefore, be allegations of an "'affirmative link' between a supervisor's conduct and the constitutional violation" in order to state a claim. <u>Id.</u>

This "affirmative link" can be established by "allegations of personal direction or of actual knowledge and acquiescence." <u>Woodward v. City of Worland</u>, 977 F.2d 1392, 1400 (10th Cir. 1992). The Tenth Circuit has explained that active participation or

---

[15] Because the Court ultimately concludes that General Steel has not alleged any valid constitutional violation by the BBB Defendants, and therefore the § 1983 claims against the BBB Defendants fail, it is unnecessary for the Court to address the BBB Defendants' defense of qualified immunity.

-28-

acquiescence in a constitutional violation can take many forms, including "the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." Serna v. Colorado Dept. of Corr., 455 F.3d 1146, 1151 (10th Cir. 2006) (quotation omitted). "A plaintiff may also establish an affirmative link where the supervisor tacitly authorized the offending acts." Id. (quotation omitted). In the end, however, the Tenth Circuit has explained that "supervisory liability must be based upon active unconstitutional behavior and more than a mere right to control employees." Id. (quotation omitted).

### i. BBB Director Defendants

Here, General Steel tries to allege an "affirmative link" based on the BBB Director Defendants' "failure to supervise." General Steel alleges that "numerous 'red flags'"[16] alerted or should have alerted the 23 BBB Director Defendants to the conduct of the Denver/Boulder BBB employees.[17] For a plaintiff to state a § 1983 claim under a "failure

---

[16] General Steel alleges that these "red flags" included: (1) the Denver/Boulder BBB employees were inexperienced; (2) there was no ethics or compliance program; (3) for ten months, starting in October 2002, the national CBBB had determined that the Denver/Boulder BBB was out of compliance with Operating Standards related to Reliability Reports; (4) Denver/Boulder BBB CEO Herman's focus on "get[ting] tough" on business; (5) the Denver/Boulder BBB contractual relationship with the Consumer Protection Section of the Colorado Attorney General's Office; (6) the Denver/Boulder BBB's deceptive sales practices; and (7) the General Steel state court lawsuit, which alleged violations of BBB operating standards, policies, procedures, agreements, directives, and advertising.
General Steel does not allege the Colorado AG's successful prosecution of General Steel for deceptive sales and advertising practices as one of these so-called "red flags."

[17] Although General Steel conclusorily alleges that the BBB Directors "sanctioned and condoned" the Denver/Boulder BBB's employees' actions, General Steel does not allege any particular act or statement by the BBB Director Defendants that indicates a causal connection between the actions of the BBB Director Defendants

to supervise" theory of liability; however, the defendant must "ha[ve] a duty to supervise." Id. at 1154. "Unless a supervisor has established or utilized an unconstitutional policy or custom, a plaintiff must show that the supervisory defendant breached a duty imposed by state or local law which caused the constitutional violation." Meade v. Grubbs, 841 F.2d 1512, 1528 (10th Cir.1988); see also Serna, 455 F.3d at 1154 (§ 1983 claim failed against Director of Prisons because plaintiff did not establish that Director had an actual duty to supervise on-the-ground operations of officers who allegedly committed excessive force violation).

General Steel, however, cannot establish an "affirmative link" based on the BBB Director Defendants' "failure to supervise" because it has not alleged that the Director Defendants had a duty imposed by state or local law to supervise the daily activities of the BBB employees. Furthermore, it is not even clear whether General Steel has adequately alleged that the Director Defendants had any duty to supervise, as the normal responsibilities of a Board member do not include "supervising" employees, and Boards of Directors do not have the ability to hire and fire employees. Even if the Director Defendants had a right to control the BBB employees, however, "supervisory liability must be based upon active unconstitutional behavior and more than a mere right to control employees." Serna, 455 F.3d at 1151.

Therefore, General Steel cannot prevail on any of its § 1983 claims against the

---

and the alleged unconstitutional conduct of the Denver/Boulder BBB employees. General Steel, rather, alleges that these "red flags" should have "further heightened the Director's level of supervision and oversight to ensure proper reporting of General Steel that was uncompromised by litigation goals and objectives." (Response to BBB Director Defendants' Motion to Dismiss, Doc. 212 at 5.)

BBB Director Defendants because of the failure to allege that they personally participated in any alleged unconstitutional violations.

## ii. **CBBB Defendants**

Likewise, General Steel does not allege any "affirmative link" between the CBBB Defendants and any alleged unconstitutional action by the Denver/Boulder BBB employees. Therefore, General Steel cannot prevail on any of its § 1983 claims against the CBBB Defendants because of the failure to allege that they personally participated in any alleged unconstitutional violations.

## 2. <u>Equal Protection Clause</u>

In its first 42 U.S.C. § 1983 claim for relief, General Steel avers that all defendants violated the company's Fourteenth Amendment equal protection rights. General Steel argues that the defendants singled General Steel out for arbitrary treatment by prosecuting General Steel, defaming General Steel, falsely testifying at trial, and other misconduct which it asserts is fairly attributable to the State.

The Equal Protection Clause prohibits any state from denying "any person within its jurisdiction the equal protection of the laws." The Clause "creates no substantive rights. Instead, it embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." <u>Vacco v. Quill</u>, 521 U.S. 793, 799 (1997).

General Steel proceeds on a "class of one" theory, arguing that it has been treated differently from others similarly situated without any rational basis for the disparate treatment. <u>See</u> <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (per curiam); <u>Mimics, Inc. v. Vill. of Angel Fire</u>, 394 F.3d 836, 848-49 (10th Cir. 2005) (applying "class of one" analysis where plaintiffs did not allege they were part of an

identifiable group).  "In the paradigmatic class-of-one case, a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive." Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d 1202, 1209 (10th Cir. 2006) (citation omitted).   The Tenth Circuit seems to have followed the lead of Justice Breyer's concurrence in Olech and "cabin[ed] the reach of class-of-one equal protection cases by demanding that plaintiffs present evidence not merely of arbitrariness but of malice or ill-will against the plaintiff." Jennings v. City of Stillwater, 383 F.3d 1199, 1211 (10th Cir. 2004) ("noting the absence of allegations of ill will but basing the decision on the plaintiff's failure to show that the official action lacked legitimate justification").  But see Jicarilla Apache Nation, 440 F.3d at 1210 (stating that the Tenth Circuit has struggled, but left open, the question of whether an allegation of subjective ill will is required).  Thus, under a "class of one" equal protection theory, General Steel must prove that "the action taken by the state . . . was a spiteful effort to 'get' [the company] for reasons wholly unrelated to any legitimate state objective." Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 849 (10th Cir. 2005) (quotation omitted).  Of course, as with any other equal protection claim, General Steel must also show that it was treated differently than another who is similarly situated company.  Id.; see also Powers v. Harris, 379 F.3d 1208, 1215 (10th Cir. 2004) ("[T]he essence of the equal protection claim is that the state treat all those similarly situated similarly.").[18]

_____

[18]  In so far as General Steel has attempted to assert its equal protection claim based solely on malice or ill-will attributable to defendants, such allegations are not sufficient, by themselves, to support an equal protection clause claim on a "class of one" theory. See Jicarilla Apache Nation, 440 F.3d at 1210.

The Tenth Circuit, however, is not sympathetic to a "class of one" theory, generally.  See Jennings, 383 F.3d at 1210-11; see also Jicarilla Apache Nation, 440 F.3d at 1209 (noting circuit courts "have proceeded cautiously in applying the [class-of-one] theory, sensitive to Justice Breyer's warning against turning even quotidian exercises of government discretion into constitutional causes").  And the Supreme Court recently made clear that, whatever the contours of the "class of one" theory, it does not apply to all governmental conduct.  See Engquist v. Oregon Dept. Of Agriculture, — U.S. —, 128 S.Ct. 2146, 2151 (2008) (holding that class-of-one equal protection theory "does not apply in the public employment context.").  The Engquist Court noted there are certain arm's length regulatory situations that the "class of one" theory particularly fits, such as the zoning board's actions in Olech, where there existed "a clear standard against which departures, even for a single plaintiff, could be readily assessed."  Engquist, 128 S.Ct. at 2153.  However, other contexts, such as the public employment context —  where similarly situated individuals are frequently treated differently because of the range of subjective, discretionary factors that go into the decision — are a poor fit for a class of one theory of equal protection.  As the Court noted,

> [t]here are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

Id. at 2154.  Instead, in these other situations, the plaintiff's real claim is a challenge to the underlying nature of the government action and not the constitution's mandate that the government treat like individuals alike.  Id.

It is far from clear that a "class of one" equal protection claim is the appropriate way to challenge the actions General Steel complains of.  The alleged state action here (discriminatory prosecution and publication and dissemination of information) appears to entail the exercise of discretionary authority based on subjective, individualized determinations, and General Steel has not presented a clear standard against which alleged departures can be measured.  However, the Court recognizes that the Tenth Circuit has considered the class-of-one equal protection theory in a number of contexts, see Pignanelli v. Pueblo Sch. Dist. No. 60, 540 F.3d 1213, 1221 n. 3 (10th Cir. 2008) (citing cases), and will proceed to consider each of the elements required to state a cognizable class of one equal protection claim.

### a.  Rational Basis

General Steel has alleged that the Colorado Attorney General's Office, alongside various private parties, has purposefully taken arbitrary actions against the company. However, "[t]o survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications."  Teigen v. Renfrow, 511 F.3d 1072, 1083 (10th Cir. 2007) (quoting Brown v. Zavaras, 63 F.3d 967, 971-72 (10th Cir. 1995)).  If the court can conceive of any rational basis for the classification, it must uphold the state's action "regardless of whether the reason ultimately relied on is provided by the parties or the court" and regardless of whether the reason is "based on any evidence or empirical

data." Renfrow, 511 F.3d at 1084. Similarly, in the "class of one" context, the court

must consider any rational explanation for the state's treatment of the plaintiff. Cf.

Stotter v. Univ. of Tex. at San Antonio, 508 F.3d 812, 824 (5th Cir. 2007).

Here, that presumption takes the form of a very plausible platform: the Better

Business Bureau, in conjunction with the Colorado Attorney General, sought to enforce

Colorado's consumer protection laws against a company, General Steel, that had

violated those laws. Likewise, the 9 News Defendants reported on news worthy matters

of public interest, and the BBB enforced its standards against a corporation that was

violating them. That their actions were rational is amply supported by the Jefferson

County Court's findings in Phase I of Colorado AG's consumer protection action that

General Steel engaged in deceptive sales and advertising practices.[19] The Jefferson

---

[19] Specifically, Judge R. Brooke Jackson of the Jefferson County District Court
concluded that General Steel had committed several violations of the Colorado
Consumer Protection Act (CCPA), and that

> General Steel made false and misleading representations and omitted
> material information in its advertising and sales practices that were
> frequent, continual and intentional over a period of years beginning at
> least by 1997 and continuing at least through . . . approximately February
> 2004.

(See Doc. 167, Ex. K, "Findings, Conclusions and Order of Judgment," State of
Colorado v. General Steel Domestic Sales, L.L.C., Jefferson County Colorado District
Court, Case No. 2004-CV-143 (Dec. 4, 2004).) The Court takes judicial notice of this
order of judgment pursuant to Federal Rule of Evidence 201. See Amphibious
Partners, LLC v. Redman, 534 F.3d 1357, 1362 (10th Cir. 2008) (judicial notice
particularly applicable to court records in prior litigation closely related to case before it).
The court's consideration of Judge Jackson's findings does not convert the
defendants' 12(b)(6) motions into motions for summary judgments because Judge
Jackson's order was referred to in the SAC, it is central to General Steel's claims, and
General Steel does not dispute the order's authenticity. See Alvarado, 493 F.3d at
1215 ("[N]otwithstanding the usual rule that a court should consider no evidence beyond
the pleadings on a Rule 12(b)(6) motion to dismiss, 'the district court may consider

Count District Court's Phase I findings are sufficient, therefore, to establish that the defendants had a plausible reason to be concerned with General Steel's practices, even if it later evolved into a vendetta against General Steel.

### b. Malice

Although General Steel attributes all manners of maliciousness and ill will to the various members of the alleged conspiracy, it never proffers facts that would explicate a motive, a reason for the rampant malice alleged in the complaint. The defendants jointly are alleged to have conspired "to harm or destroy General Steel," but the complaint never offers any reason why.

### c. Similarly Situated Parties

Even if General Steel had been able to adequately allege discriminatory, arbitrary, and malicious state action (which it has not done), General Steel still must adequately allege that similarly situated persons were treated differently. Jennings, 383 F.3d at 1213; id. (it is this requirement that distinguishes the Equal Protection Clause from the Due Process Clause). When looking only at one individual (as opposed to a class of individuals), the Tenth Circuit has noted that "there is no way to know whether the difference in treatment was occasioned by legitimate or illegitimate considerations without a comprehensive and largely subjective canvassing of all possible relevant factors." Id. at 1213–14.[20] Therefore, it is "imperative for the class-of-one plaintiff to

_____

documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'") (quoting Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002)).

[20] The adequate pleading of similarly situated parties is especially relevant to establishing a clear standard against which departures can be measured, and

provide a specific and detailed account of the nature of the preferred treatment of [similarly situated individuals]." Id.

The alleged state action in the SAC is sui generis, necessarily depending on a multiplicity of relevant variables, which mandates specific factual pleading of the similarity between General Steel and other businesses, so that it is possible for the Court to discern that General Steel was in fact treated differently. See id. at 1215 (noting that the "multiplicity of relevant (nondiscriminatory) variables requires plaintiff to provide compelling evidence of other similarly situated persons who were in fact treated differently"). Here, General Steel, however, has failed to allege adequately similarly situated businesses (although General Steel obliquely references Steelwise and other competitors in the steel building industry), sufficient to establish that it was arbitrarily singled out for different treatment by defendants.

### d. Conclusion

Therefore, General Steel has failed to state a § 1983 claim for violation of its equal protection rights against any defendant because it has not adequately alleged that its right to equal protection under the law was violated by any of the defendants. Additionally, as alternative grounds for dismissal: General Steel has not adequately alleged that state action existed as to the Nebraska Defendants and 9 News Defendants; and, General Steel has not adequately alleged circumstances to give rise to supervisory liability by the BBB Director Defendants and CBBB Defendants. For all of the foregoing reasons, General Steel's first claim for relief is DISMISSED against the

establishing that the government action is of an appropriate type that it can be reviewed under a class of one theory.

9 News Defendants, the BBB Defendants, and the Nebraska Defendants.

### 3. **Due Process**

Additionally, General Steel claims that it was deprived of unspecified constitutional rights without due process in violation of the Fourteenth Amendment. The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const., amend. 14, § 1. The Due Process Clause requires fair process before life, liberty, or property can be deprived, and "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." County of Sacramento v. Lewis, 523 U.S. 833, 840 (1998) (quotation omitted).

Problematically, the complaint provides no guidance as to what liberty or property interest General Steel believes it was deprived of without appropriate process or what substantive due process violations occurred, and which defendants committed those deprivations. Left adrift, the Court must seek guidance in General Steel's responses to the motions to dismiss.

General Steel hints that the rights at issue are the "constitutional right to not be deprived of liberty by fabrication of evidence," and the right not to be subject to malicious conduct or malicious prosecution. (See General Steel's Response to the Beers/Jarvis's Motion to Dismiss at 8). However, the authorities that General Steel cites for these constitutional rights do not support the company's claims. In Zahrey v. Coffey, 221 F.3d 342 (1st Cir. 2000), the court noted that "[t]he manufacture of false evidence, 'in and of itself,' . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right." Id. at 348. Rather, the Zahrey court explained that the

-38-

fabrication of evidence must precipitate a deprivation of liberty in order to violate a constitutional right. Id.

Here, General Steel was not deprived of liberty or property as a result of any allegedly manufactured evidence against it. Mr. Jarvis testified at the preliminary injunction hearing, but it was General Steel who voluntarily entered into a stipulated preliminary injunction. Similarly, any alleged fabrications by the Denver/Boulder BBB, which might have encouraged the Colorado AG's office to prosecute General Steel, did not lead to the impairment of General Steel's liberty or property interests; rather, it simply lead to a prosecution.

Likewise, General Steel obviously can not allege that the Colorado AG's suit was a malicious prosecution. Assuming, arguendo, that a company can assert a claim for a malicious prosecution of a civil enforcement suit,[21] "the alleged malicious prosecution must be conscience-shocking." See Torres, 893 F.2d at 410. A "due process claim for malicious prosecution [also] arises only once the original action . . . has been terminated in favor of the plaintiff." Mondragon v. Thompson, 519 F.3d 1078, 1083 (10th Cir. 2008). Here, the Jefferson County Colorado District Court found that General Steel "frequent[ly], continual[ly] and intentional[ly]" engaged in deceptive sales and advertising practices and concluded that General Steel violated several provisions of the Colorado Consumer Protection Act. (See Doc. 167, Ex. K, "Findings, Conclusions and Order of Judgment," State of Colorado v. General Steel Domestic Sales, L.L.C., Jefferson

_____

[21] The malicious prosecution cases cited by General Steel sound in criminal prosecutions — the plaintiffs in Usher v. City of Los Angeles, 828 F.2d 556 (9th Cir. 1987) and Torres v. Superintendent of the Police of Puerto Rico, 893 F.2d 404 (1st Cir. 1990), were subjected to allegedly improper criminal prosecutions.

County Colorado District Court, Case No. 2004-CV-143 (Dec. 4, 2004).) General Steel eventually voluntarily settled the Colorado AG's action for $4.5 million. General Steel cannot prevail on a claim for malicious prosecution because the initiation of the Colorado AG's action does not shock-the-conscience and the Colorado AG's action against General Steel was not terminated in General Steel's favor.[22]

Although General Steel does not argue that the defendants' actions violated its constitutional rights by arbitrarily damaging its interest in its reputation, even if General Steel had alleged this interest was involved, its claim would fail. See Gwinn v. Awmiller, 354 F.3d 1211, 1216 (10th Cir. 2004) ("Damage to one's reputation alone is not enough to implicate due process protections. Instead a plaintiff . . . must demonstrate that: (1) the government made a statement about him or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she asserts is false, and (2) the plaintiff experienced some governmentally imposed burden that significantly altered [his or] her status as a matter of state law.") (internal citations and quotations omitted).

Therefore, General Steel has failed to state a § 1983 claim for violation of itsdue process rights against any defendant because it has not adequately alleged any substantive or procedural right that was violated by any of the defendants. Additionally, as alternative grounds for dismissal: General Steel has not adequately alleged that state action existed as to the Nebraska Defendants and 9 News Defendants; and, General

---

[22] In so far as General Steel generally alleges that it was subjected to malicious conduct by defendants and that such conduct would "shock the conscience," the Court is unpersuaded.

Steel has not adequately alleged circumstances to give rise to supervisory liability by the BBB Director Defendants and CBBB Defendants.  For all of the foregoing reasons, General Steel's second claim for relief is DISMISSED against the 9 News Defendants, the BBB Defendants, and the Nebraska Defendants.

### 4.  § 1983 Conspiracy

"Allegations of conspiracy [to deprive constitutional rights] may . . . form the basis of a § 1983 claim." <u>Tonkovich</u>, 159 F.3d at 533.  A plaintiff must plead state action and prove (1) a conspiracy and (2) an actual deprivation of constitutional rights. <u>Dixon v. City of Lawton</u>, 898 F.2d 1443, 1449 (10th Cir. 1990).  "Provided that there is an underlying constitutional deprivation, the conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy."  <u>Id.</u> at 1449 n.6.  In order for a plaintiff adequately to allege a conspiracy "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants," <u>Tonkovich</u>, 159 F.3d at 533, and "[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983  claim," <u>id.</u> (quotation omitted).

Here, General Steel has pled insufficient allegations of "concerted action" by any defendants to deprive General Steel of his constitutional rights.  And, more fundamentally, General Steel has failed to allege that any of the actions agreed to would constitute state action and a violation of General Steel's constitutional rights.

Therefore, General Steel's § 1983 conspiracy claim is DISMISSED against the 9 News Defendants, the BBB Defendants, and the Nebraska Defendants.

### 5. **RICO**

General Steel also attempts to allege claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 – 1968, against all defendants. RICO provides as "one of [its] enforcement mechanisms . . . a private right of action, available to '[a]ny person injured in his business or property by reason of a violation' of the Act's substantive restrictions." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 453 (2006) (quoting 18 U.S.C. § 1964(c)). Substantively, RICO "prohibits certain conduct involving a 'pattern of racketeering activity.'" Anza, 547 U.S. at 453. The private cause of action provides for treble damages. See 18 U.S.C. § 1964(c).

General Steel alleges that defendants violated 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To state a RICO claim based on a violation of § 1962(c), a plaintiff must allege that each defendant participated in the "(1) conduct (2) of an enterprise, (3) through a pattern (4) of racketeering activity." Sedima, 473 U.S. at 496; Tal v. Hogan, 453 F.3d 1244, 1269 (10th Cir. 2006); United States v. Smith, 413 F.3d 1253, 1266 (10th Cir. 2005). Also, a plaintiff only has standing to bring a RICO claim if he was injured by reason of defendant's violation of § 1962. See Deck v. Engineered Laminates, 349 F.3d 1253, 1257 (10th Cir. 2003).

Initially, General Steel has not stated any valid RICO claims because it has failed to adequately allege the existence of a RICO enterprise. Furthermore, General Steel has failed to allege that most of the defendants participated in the conduct of a RICO enterprise.

## A. RICO Enterprise

General Steel must plausibly plead that all the defendants participated in the affairs of an "enterprise," as defined in 18 U.S.C. § 1961(c).  That term "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  Id. § 1961(4).   In United States v. Turkette, 452 U.S. 576, 583 (1981), the Supreme Court held that a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  In this circuit, to prove that there was an enterprise, the plaintiff must offer evidence of three elements (1) "the existence of 'an ongoing organization with a decision-making framework or mechanism for controlling the group,'" (2) "'that various associates function as a continuing unit,'" and (3) "that the enterprise exists 'separate and apart from the pattern of racketeering activity.'" Smith, 413 F.3d at 1266-67 (quoting United States v. Sanders, 928 F.2d 90, 943-44 (10th Cir. 1991)).

Here, General Steel alleges that the Consumer Protection Section and the Denver/Boulder BBB's partnership in the Colorado Consumer Line constituted a RICO enterprise.  The contractual relationship forming the Consumer Line required the Denver/Boulder BBB to provide certain services to the Colorado AG's Office for a fee, originally $10,000 and then increased to $100,000.  The contract provided that the Denver/Boulder BBB would receive and inventory consumer complaints and provide monthly reports of the information to the Consumer Protection Section.  The Consumer Protection Section would use this information to help it target individuals and businesses engaging in patterns and practices of fraud.  The Denver/Boulder BBB also agreed to

share all of its information and granted the Consumer Protection Section access to their BBB files, and the Denver/Boulder BBB and Colorado AG agreed to coordinate their efforts with the media.

The leap from a service contract to an "enterprise" is ultimately impossible for General Steel to make. The Denver/Boulder BBB and the Colorado Attorney General's office did not function as a group or a continuing unit: rather their alleged relationship was of a purchaser and a provider of services. Under their relationship, each organization continued to maintain their own separate decision-making framework — the Colorado Consumer Line was not alleged to create a mechanism for controlling the Denver/Boulder BBB and AG, jointly.[23] General Steel attempts to bolster its argument that a RICO enterprise existed by referencing the fact that both the Denver/Boulder BBB and the Colorado AG referred to their contractual relationship as a "partnership." This allegation, however, is insufficient to boost their relationship to an organized, association of persons as required by RICO. The contractual relationship was formed merely to serve as a conduit for the flow of information of consumer complaints from the BBB to the AG and did not create a group or unit with a mechanism to act on that information.

Therefore, General Steel's RICO claims cannot survive against any of the defendants because of General Steel's failure to allege a RICO enterprise.

---

[23] Importantly, the SAC does not include any allegations that the Denver/Boulder BBB exercised the AG's prosecutorial discretion; rather, the SAC only includes allegations that the Denver/Boulder BBB made recommendations to the Consumer Protection Section.

**B. Conduct – Operation or Management Test**

Furthermore, even if General Steel had adequately alleged a RICO enterprise that engaged in a pattern of racketeering activity, its claims against the Nebraska Defendants, 9 News Defendants, BBB Director Defendants, and CBBB Defendants still could not survive, because the company has failed to adequately allege that any of these defendants participated in the conduct of such RICO enterprise.

Under Reves v. Ernst & Young, 507 U.S. 170, 185 (1993), § 1962(c)'s conduct requirement authorizes recovery only against those who "participate in the operation or management of the enterprise itself." The high Court explained that in order for this test to be satisfied, "one must have some part in directing [an enterprise's] affairs." Id. at 179 (emphasis added). RICO liability "is not limited to those with primary responsibility for the enterprise's affairs," or "to those with a formal position in the enterprise," but includes anyone who has "some part in directing the enterprise's affairs." Id. Operation of an enterprise is not just limited to upper management, but also includes lower rung participants in the enterprise who are under the direction of upper management. Id. at 184; see also Tal, 453 F.3d at 1269; Resolution Trust, 998 F.2d at 1541 (Although the defendant must have participated in the operation or management of the RICO enterprise, "it is not necessary for the participant to have significant control."). Also, the Supreme Court has explained that an enterprise might be "operated" or "managed" by outsiders having no official position with the enterprise who, nonetheless, may be liable if they are "associated with" the enterprise and "exert control over it as, for example, by bribery." Reves, 507 U.S. at 184.

### i. Nebraska Defendants & 9 News Defendants

Both the Nebraska Defendants and 9 News Defendants are not alleged to be formally part of the enterprise, but are alleged to have been outsiders associated with the criminal enterprise. The mere involvement and association with an enterprise does not establish control.

Although, misrepresenting material facts to influence judicial proceedings is a serious allegation, General Steel did not allege that Dana or Sue Beers or Kirk Jarvis directed or managed or otherwise exerted control over the enterprise. Cf. Handeen v. Lemaire, 112 F.3d 1339, 1348 (8th Cir. 1997) ("Congress did not mean for § 1962(c) to penalize all who are employed by or associated with a RICO enterprise, but only those who, by virtue of their association or employment, play a part in directing the enterprise's affairs.").

Likewise, General Steel alleges that the 9 News Defendants committed wire fraud by publishing disparaging website articles and television broadcasts about General Steel. These allegations are not sufficient to establish that the 9 News defendants directed or managed or otherwise exercised control over the enterprise. Cf. Goren v. New Vision Int'l, Inc., 156 F.3d 721, 728 (7th Cir. 1998) ("[S]imply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under § 1962(c); instead, the individual must have participated in the operation and management of the enterprise itself.").

### ii. BBB Director Defendants & CBBB Defendants

Both General Steel and the BBB Defendants focus their arguments on whether the BBB Director Defendants and the CBBB Defendants participated in the conduct of

the RICO enterprise, and omit focusing directly on the BBB Officer Defendants and Denver/Boulder BBB.  As a result, the Court will follow the parties lead and only address whether the members of the Denver/Boulder BBB Board of Directors or the CBBB defendants directed or managed or otherwise exercised control over the enterprise.

When reduced to their essentials, General Steel's allegations against the BBB Director Defendants and CBBB defendants are that they allowed the BBB Officer Defendants to carry out the officers' fraudulent plan.  General Steel summarizes its argument in its opposition memorandum to the BBB's Motion to Dismiss: that by virtue of these defendants' supervisory role over the BBB Officer Defendants, they had "'some part' in directing the enterprise's affairs."  (General Steel's Response to BBB Defendants Motion to Dismiss, Doc. 211, at 29.)  General Steel, however, has not alleged how any of these defendants specifically directed the enterprise's affairs. General Steel's conclusory allegations that all of these defendants had knowledge of and acquiesced in the BBB Officers' conduct is insufficient to establish that they had a part in directing the enterprise's affairs.  See Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346-47 (S.D.N.Y. 1998) (plaintiff did not plead participation in the conduct of enterprise's affairs when plaintiff merely alleged that it "knowingly allowed" co-defendant to use bank accounts and conduct transactions which bank knew were fraudulent).

### iii. Conclusion

Therefore, even if General Steel adequately alleged a RICO enterprise, General Steel's RICO claims can not succeed against the BBB Director Defendants, CBBB Defendants, 9 News Defendants, and Nebraska Defendants, because it failed to allege that these defendants participated in the conduct of such RICO enterprise.

### C. Conclusion

General's Steel has failed to adequately allege a RICO claim against any defendant because it did not allege a RICO enterprise. Furthermore, even if a RICO enterprise existed, General Steel failed to allege that the BBB Director Defendants, CBBB Defendants, 9 News Defendants, and Nebraska Defendants participated in the conduct of such RICO enterprise. Therefore, for the foregoing reasons, General Steel's RICO claim is DISMISSED against the 9 News Defendants, the BBB Defendants, and the Nebraska Defendants.[24]

### 6. <u>RICO Conspiracy</u>

Section 1964(c) provides a cause of action available to anyone "injured . . . by reason of" a "conspir[acy] to violate any of the provisions of subsection (a), (b), or (c) of [§ 1962]." <u>Beck v. Prupis</u>, 529 U.S. 494, 501 (2000). A plaintiff suing under § 1964(c) for a RICO conspiracy must allege that a conspirator "intend[ed] to further an endeavor which, if completed," would be an actionable violation under § 1962(a)-(c). <u>See</u> <u>Salinas v. United States</u>, 522 U.S. 52, 65 (1997). In order to state a viable claim under the conspiracy provision of RICO, a plaintiff must allege (1) that the defendant agreed to participate in the operation or management of the enterprise itself, and (2) that the defendant further agreed that someone would commit at least two predicate acts. <u>See</u> <u>Goren</u>, 156 F.3d at 732; <u>see also</u> <u>Smith</u>, 413 F.3d at 1272 (For a plaintiff to prove a conspiracy, he must prove that the defendant "knew about and agreed to facilitate the

---

[24] The Court has significant doubts about whether General Steel has adequately alleged a "pattern of racketeering activity"; however, it is unnecessary for the Court to resolve this issue in ruling on the motion to dismiss.

commission of — rather than personally committed or agreed to commit — at least two of the predicate acts constituting a pattern of racketeering activity.").  "There is no requirement of some overt act or specific act in the [RICO conspiracy statute], unlike the general conspiracy provision applicable to federal crimes."  Salinas, 522 U.S. at 63.

Here, as previously discussed, any alleged endeavor did not satisfy all of the elements of a § 1962(c) violation; therefore, any alleged agreement to participate in such endeavor to commit these offenses can not be a violation of the RICO conspiracy statute.  Furthermore, General Steel has pled insufficient allegations that defendants agreed to participate in a RICO enterprise and intended to further a criminal endeavor. As a result, General Steel's RICO conspiracy claims against the BBB Defendants, 9 News Defendants, and Nebraska Defendants are DISMISSED.


## V.  FEDERAL LAW CLAIMS AGAINST STEELWISE

In Steelwise's answer to the original complaint, it raised several affirmative defenses, including that General Steel's § 1983 and RICO claims failed to state a claim for relief under Rule 12(b)(6).  (Doc. 21.)  Steelwise did not file a new answer or Rule 12(b)(6) motion in response to the SAC; however, that is explained by the fact that Steelwise is in receivership and currently has not retained counsel to appear in court in this action.  In these circumstances, we will treat Steelwise's Rule 12(b)(6) arguments as renewed as to the SAC.  The defects in the SAC as to the other defendants are equally apparent as to Steelwise, as far as the federal claims are concerned: with respect to the § 1983 claims, General Steel has failed to allege, inter alia, state action by Steelwise, and has failed to allege a viable constitutional violation; and, with respect

to the RICO claims, General Steel has failed to allege, inter alia, a RICO enterprise, and that Steelwise participated in the conduct of a RICO enterprise. Accordingly, the Court deems Steelwise's answer to the first complaint equally applicable to the SAC, and DISMISSES the federal claims asserted against it.[25]


## VI. CLAIMS AGAINST THE DROPPED DIRECTOR DEFENDANTS

Dwight Brown, Steve Budnack, Ressie Pate, Allan Service, Suzanne Shaw, David Smith, Judith Spires, Darrel Vessels, and Deborah West — all former members of the Denver/Boulder BBB Board of Directors — were all named as defendants in the original complaint, but in the SAC, General Steel no longer alleges any claims against them. The SAC's caption has been modified to delete any reference to them as defendants in this action; however, General Steel has not filed a notice of dismissal against these parties in accordance with Rule 41(a)(1) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 41(a)(1)(A) ("[P]laintiff may dismiss an action without a court order by filing: (i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment . . . ."). This Court has not yet issued a formal order dismissing these defendants from this action, and Dwight Brown, Steve Budnack, Ressie Pate, Allan Service, Suzanne Shaw, David Smith, Judith Spires, Darrel Vessels, and Deborah West's move this Court to formally dismiss them from this action without prejudice. (Doc. 150.) The filing of the SAC without any reference to

---

[25] Also, all claims against Donahue are DISMISSED based on General Steel's concession in the SAC and at February 26 motions' hearing that it is not now asserting any further claims against Donahue.

these parties constituted a voluntary dismissal of all claims, without prejudice, against these defendants.  See Pedrina v. Chun, 987 F.2d 608, 610 (9th Cir. 1993) (filing of an amended pleading which drops reference to a defendant constitutes a Rule 41 voluntary dismissal).  Nonetheless, these defendants request the Court to confirm that the filing of the SAC constituted a voluntary dismissal of all claims against them without prejudice, so that they have proof to show any lender, investor, or other person considering doing business with any of them that they are no longer parties to this action.  General Steel did not object to these defendants' request that the Court order that the all claims against them are dismissed without prejudice.  Therefore, all claims against Dwight Brown, Steve Budnack, Ressie Pate, Allan Service, Suzanne Shaw, David Smith, Judith Spires, Darrel Vessels, and Deborah West, are DISMISSED without prejudice.

## VII.  SUPPLEMENTAL JURISDICTION

General Steel asserts six state law claims against some or all of the BBB Defendants: a claim for (1) deceptive trade practices against the BBB Defendants; (2) breach of contract against the Denver/Boulder BBB; (3) breach of the covenant of good faith and fair dealing against the Denver/Boulder BBB; (4) interference with contractual relations against the BBB Defendants; (5) interference with prospective business advantage against the BBB Defendants; and (6) fraud against the Denver/Boulder BBB, Herman, and Fehling.  These claims were previously brought in Jefferson County District Court, but after the district court granted General Steel's request for voluntary dismissal, General Steel amended its complaint before this Court to assert state law claims against the BBB Defendants.

General Steel also asserts three state law claims against the Steelwise: a claim for (1) interference with contractual relations, (2) interference with prospective contractual relations, and (3) fraud.

Supplemental jurisdiction "is exercised on a discretionary basis, keeping in mind considerations of judicial economy, convenience and fairness to the litigants." Bauchman for Bauchman v. West High School, 132 F.3d 542, 549 (10th Cir. 1997); see also 28 U.S.C. § 1367(c). "If federal claims are dismissed before trial, leaving only issues of state law, 'the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'" Bauchman, 132 F.3d at 549 (quoting Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 (1988)). In light of the Court's grant of dismissal of all of General Steel's federal claims, the Court no longer has original jurisdiction over any remaining claims in this action,[26] and these independent state claims now predominate. Therefore, because the federal claims have been disposed of, it is appropriate for the Court to decline to exercise supplemental jurisdiction over the remaining state law claims and dismiss those claims without prejudice. Additionally, this Court notes that General Steel had been litigating its claims against the BBB Defendants for several years in state court, and is currently litigating claims against Steelwise in state court. Several of General Steel's claims against the

---

[26] The Court does not have original subject matter jurisdiction over any of the state law claims under 28 U.S.C.§ 1332, because complete diversity does not exist between General Steel and all of the remaining defendants. See Symes v. Harris, 472 F.3d 754, 758 (10th Cir. 2006) ("Under 28 U.S.C. § 1332, a party must show that complete diversity of citizenship exists between the adverse parties and that the amount in controversy exceeds $75,000."). For diversity purposes, General Steel is a citizen of Colorado and Steelwise and all of the BBB Defendants, except for four of them, are citizens of Colorado, as well.

BBB Defendants had survived summary judgment and were only months away from trial when General Steel convinced the state court to grant its request for a voluntary dismissal so that it could attempt to add those claims to this action.  The Colorado state courts are, therefore, well positioned to handle the remaining state law claims if General Steel decides to re-file in state court.


## VIII.  CONCLUSION

For the foregoing reasons, the Court ORDERS the following:

(1) all state law claims against Dana and Sue Beers, Kirk Jarvis, Chip Yost, Adam Schrager, and Gannett Co., Inc., are DISMISSED WITH PREJUDICE;

(2) all federal claims against Dana and Sue Beers, Kirk Jarvis, Chip Yost, Adam Schrager, Gannett Co., Inc., Jean Herman, Matt Fehling, Carrie King Rossman, Joe Toscano, Geta Asfaw, Bowen Banbury, Darrell Brown, Toti Cadavid, Janice Campbell, Joe Conrad, Larry Dudman, Hope Marie Dunlavey, Barbara Grimm, Breckenridge Grover, Mark Johnson, Jerald Kaiser, Tony King, Donlee Lane, Tamela Lee, Jeff Metz, Rob Naish, Dean Pisciotta, Mark Renn, Craig Reynolds, Jon Robinson, Steven Salter, Bill Stevenson, Kenneth Hunter, Denver/Boulder Better Business Bureau, Council of Better Business Bureaus, Inc., and Steelwise, Inc., are DISMISSED WITH PREJUDICE;

(3) all claims against Dwight Brown, Steve Budnack, Ressie Pate, Allan Service, Suzanne Shaw, David Smith, Judith Spires, Darrel Vessels, and Deborah West are DISMISSED WITHOUT PREJUDICE;

(4) all claims against Harold Donahue are DISMISSED WITHOUT PREJUDICE;

(5) because the Court does not have original jurisdiction over any of the

remaining state law claims, the Court declines to exercise supplemental jurisdiction over

those claims and, therefore, the state law claims against Jean Herman, Matt Fehling,

Carrie King Rossman, Joe Toscano, Geta Asfaw, Bowen Banbury, Darrell Brown, Toti

Cadavid, Janice Campbell, Joe Conrad, Larry Dudman, Hope Marie Dunlavey, Barbara

Grimm, Breckenridge Grover, Mark Johnson, Jerald Kaiser, Tony King, Donlee Lane,

Tamela Lee, Jeff Metz, Rob Naish, Dean Pisciotta, Mark Renn, Craig Reynolds, Jon

Robinson, Steven Salter, Bill Stevenson, Kenneth Hunter, Denver/Boulder Better

Business Bureau, Council of Better Business Bureaus, Inc., and Steelwise, Inc., and

Harold Donahue are DISMISSED WITHOUT PREJUDICE;

(6) because all claims are dismissed, this action is DISMISSED in its entirety;[27]

(7) because this action is dismissed, BBB Defendants' motion to strike is moot;

(7) because this action is dismissed, 9 News' objections to the Magistrate

Judge's discovery order are moot;

(8) each party shall bare its own costs and fees, and judgment shall be entered

accordingly.

---

[27]  In so much as General Steel's response to the motions to dismiss requested
leave to amend the complaint, General Steel's request is denied.  General Steel's
request for amendment is general, and it is not appropriate for the Court to grant an
open-ended request for amendment without specific grounds for amendment.  See
Glenn v. First Nat'l Bank in Grand Junction, 868 F.2d 368, 370 (10th Cir.1989)
(concluding that the district court did not err in failing to address the plaintiffs' request for
leave to amend, which was made in their response to the defendants' motion to dismiss,
because the request did not rise to the status of a motion and failed to set forth any
grounds for the request).  General Steel has already amended its federal action once
and having pursued an exhausting torturous trial through General Steel's rambling,
shotgun complaint, it is time to bring this federal matter to a close.

DATED THIS  2nd  day of March, 2009.

BY THE COURT:

*s/ David M. Ebel*

_____
David M. Ebel
U.S. Circuit Court Judge